SWEET v. GILMORE.

1. CONTRADICTION—EVIDENCE—PRACTICE.—A WITNESS called to impeach another cannot testify in chief as to particular facts unless they be such as directly show the witness to be unworthy of belief. Immoral connections are not usually such facts. Practice indicated.
2. FINDING OF FACT below sustained.

Before KLUGH, J., Darlington, August, 1897. Affirmed.

Foreclosure, Emiline Sweet *v.* L. H. Gilmore. The following is so much of the Circuit decree as is necessary to understand the issues on appeal:

This is an action for the foreclosure of two mortgages, given by the defendant, Gilmore, to the plaintiff—the first to secure a bond for $6,000, dated August 19th, 1886, and the second to secure a bond for $750, dated February 7th, 1888. The two mortgages cover substantially the same

property. * * * The second and main point of difference
between the parties is as to certain payments which the de-
fendant claims to have made and which the plaintiff denies—
in some instances as to any payments at all having been
made, and in others as to the correctness of the amounts
claimed to have been paid. We will examine this latter
class first, viz: where the plaintiff admits that payments
were made at the times claimed by the defendant, but denies
that they were respectively as great in amount as he claims.
It is necessary to premise that the plaintiff's business with
reference to these bonds was managed by Gen. W. E. James,
who had married her niece, and with whom she resided.
He seems to have negotiated the loans, had the custody of
the papers, and received the payments made on them, of
which there are a large number undisputed by either party.
It was his custom, when a payment was made, to credit it
on the bond, and to give the defendant a loose receipt for
the same. That he was careful to so enter the payment is
shown by the large number of credits indorsed on the
bonds. That he failed in at least one instance to credit a
payment is frankly admitted by himself on being confronted
with a receipt for $375 in his handwriting, dated December
21, 1895. There are unimportant differences as to the ex-
act dates of several credits, of which I take the date in-
dorsed on the bonds to be the true date of payment. It
appears that the payment of November 2, 1886, was made
with proceeds of sale of a parcel of the mortgaged property.
The net proceeds of the sale are shown to be $127, and
credit for the same had been duly given. The defendant
claims a credit on December 3, 1887, of $425. The bond
shows an indorsement on that date of a payment of $225,
which is proven to be the proceeds of a parcel of the mort-
gaged land sold to one Posten. The evidence convinced
me that the indorsement on the bond expresses the true
amount of the payment. The defendant claims to have
paid $401 on December 12, 1895, the receipt for which, as
for the $425, is lost. The bond shows a credit on that day

of $104. Gen. James testifies that the payment was $105. I take it that the sum credited on the bond is the correct amount of the payment. There are three other payments about which the parties are in hopeless contradiction. The defendant swears that he paid $1,200 on December 1, 1890; $1,500 on March 16, 1891; and $1,200 on October 15, 1892. He testifies that receipts for these payments were given to him by Gen. James, which he entered in a book kept by him, and in which he entered all his receipts as he got them; that he placed these with some other receipts in a trunk in his house; that on a night in 1893 his house was broken into and this trunk stolen, and that he found it next day in a field near by, broken open, and the receipts and the reports torn to pieces, scattered around, and trampled in the mud, whereby the receipts were lost. Other witnesses swear that they saw these particular receipts in Gilmore's possession, and one corroborates his account of their destruction. It does not appear that the defendant ever made known the loss of these receipts to the plaintiff or her agent, or that he asked for duplicates in place of those lost. These three large payments were not credited on the bonds, although numerous other payments intervening between them, and subsequent to the last of them, are duly credited. Gen. James denies positively that they were ever made. The defendant testifies that in May, 1893, he made a list in his book of all his receipts. This list is not in evidence, although the witness was allowed to refresh his memory from it, and he called off from it a number of payments the receipts for which he declared were lost, including all these about whose existence there is any dispute. A list of all the payments is given in the answer, and it appears that the answer is made from the books of Gilmore. This list shows the alleged payment of December, 1890, in its proper chronological place, between the payments of 1889 and those of 1891; the payment of $1,200 in October, 1892, appears out of its chronological order after those of November and December of the same year;

while that of $1,500 in March, 1891, appears low down on the list, amongst those of the year 1895. These irregularities attracted my attention after I had reached my conclusion in this case. They tend to raise a question whether this list, which Gilmore claims to have made in May, 1893, could have been made earlier than the year 1895, and whether, indeed, it may not have been made even later, when he began to fear that he might need it for the purposes of this defense. The list may not be correctly copied from the book, however, and little or no importance can be attached to the point. The sources from which the defendant derived the means to make payment on this debt appear to have been the products of his farm, which the testimony shows were comparatively small; the income from a saw-mill, which was not run regularly, and certain money arising from the sale of small portions of the mortgaged property, and from fire insurance policies on certain buildings which were burned. These last mentioned moneys are duly accounted for, and, for the most part, were applied to the debt. It appears that he was cramped for means to run his farm, and that for years he had to give liens on his crops and mortgage his land to procure the necessary advances for this purpose. He claims to have paid $1,200 in December, 1890, and $1,500 in March, 1891, making $2,700 in one season, besides other payments not disputed; while in March, 1891, he was compelled to give a crop lien and a third mortgage of his land for $1,200, in order to procure supplies for that year. He continued this arrangement from year to year, for three or four years, with the same party, falling short of paying out each year. During all that time the defendant was much pressed to meet the accruing interest on Mrs. Sweet's debt, although he claims to have made a payment in that time of $1,200 in October, 1892. When a party seeks to establish by secondary evidence a fact in direct contradiction of the proof offered by the opposite side, he ought to strengthen such evidence by proving every circumstance known to him and relevant to

the transaction. It would have been a very strong sup-
porting circumstance, easily within his power to prove, had
Mr. Gilmore shown where, in his apparently embarrassed
condition, he got the money to pay, in less than two years,
nearly $4,000 on his indebtedness, in addition to the pay-
ments admitted to have been made. * * * I have read and
considered the testimony with great care, and I have no
hesitation in arriving at the conclusion that the alleged
payments of $1,200 on December 1, 1890, $1,500 on March
16, 1891, and $1,200 on October 15, 1892, were never in
fact made.

From this decree the defendant appeals.

*Messrs. Townsend & Floyd, E. Keith Dargan*, and *J. P.
McNeill*, for appellant. The latter cites: *Impeachment of
witness:* 3 Strob., 546; 34 S. C., 16; 65 Cal., 548; 2 Strob.,
143; 14 Wend., 105; 62 Barb., 484; 1 Strob., 372; 26 S.
C., 117; 15 A. D., note 100; 17 A. D., notes 74 and 76.

*Messrs. Boyd & Brown*, contra, cite: *Impeachment of
witness:* 44 S. C., 361; 15 A. D., note 100; 1 Hill, 257; 1
Strob., 249; 22 S. C., 219.

July 4, 1898. The opinion of the Court was delivered by
MR. JUSTICE GARY. The facts of this case are set forth
in the decree of his Honor, Judge Klugh. The defendant
appealed from said decree upon exceptions, which raise
practically but two questions, the first of which is whether
the Circuit Judge erred in not sustaining the objection to
the testimony as to the immoral connections of the defend-
ant and other witnesses who testified in his behalf, which
was introduced for the purpose of showing that the defend-
ant and his other witnesses were not worthy of belief.

When a witness is examined for the purpose of impeach-
ing the credibility of another witness, the practice prevail-
ing in this State is to ask the impeaching witness: "What
is the general character of the witness, good or bad?" If

the witness under examination answers that the character is bad, then he may be asked: "Would you believe him on his oath?" But, in general, the impeaching witness can not testify upon his examination in chief to particular facts; this, however, may be done on cross-examination. *State* v. *Merriman*, 34 S. C., 38; *State* v. *Alexander*, 2 Mills, 174; *Dollard* v. *Dollard* (unreported), 1; Rice's Dig., 294; 29 Am. & Eng. Enc. of Law, 797. The exception to the rule is that the witness may testify upon his examination in chief to particular facts, when they are such as directly show that the impeached witness is unworthy of credibility, as in the case of            (anonymous), 1 Hill, 251, in which the Court says: "The credit of a witness may be assailed by showing him to be unworthy of credit in a court of justice. This is generally done by proof of bad character. And in proof of this kind, the party assailing the witness can not go into evidence of particular crimes committed by the witness (unless a conviction of felony for the *crimen falsi* can be produced), and this is what is meant by not being allowed to go into evidence of particular facts to show a want of character. For the witness is not supposed to come prepared to answer for every particular act of his life, but to show, on the whole, that he has supported such a character as entitled him to credit. But a generally bad character is not the only mode of discrediting a witness. His examination in court, or contradictory accounts of the same transaction, may authorize a jury to disbelieve him. So, too, the belief of a witness, that he was not bound on oath to tell the truth, would, if coming from his own lips, render him incompetent to be sworn, or, if after he was sworn and had testified, it was proved by another witness, it would constitute a most satisfactory reason why the jury should disbelieve him. The testimony allowed for the purpose of impeaching the testimony of Nimrod Mitchell, was of this character. It was proved that he had said, 'that if he heard any man say he *would not swear a lie, he would not believe him*, for on some particular occasions *he would,*

for he thought any man would.' * * * Is not such testimony better evidence to discredit the witness than even a want of character? * * * Such evidence is not establishing bad character from particular facts. It is showing that the witness holds such opinions of the obligations of an oath as to render him unworthy of belief, when he had called God to witness the truth of what he asserts." The particular facts as to immoral connections were not such as to take this case out of the general rule. It did not necessarily follow that the defendant and his witnesses were unworthy of belief because of immoral connections which did not directly touch the question of their veracity. If the defendant and his witnesses had indulged in immoral connections to the extent that their characters had become bad, then this fact should have been proved in the manner hereinbefore stated, which would have shown that they were unworthy of belief.

This is a case on the equity side of the Court, and, while there was error in allowing testimony to be introduced as to particular facts, the case will not be remanded for a new trial, but the other exceptions will be considered as if such testimony had not been admitted.

The second question raised by the exception is, whether there was error, on the part of the Circuit Judge, in his finding of fact as to the amount due under the mortgages. For the reasons stated by the Circuit Judge, apart from the testimony as to the immoral connections, this Court is satisfied that the exceptions raising this question cannot be sustained.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.

MR. CHIEF JUSTICE McIVER concurs in the result.