John Francis BISTRICK, Jr., a Minor over the age of Fourteen (14) years, by his Duly Appointed and Acting Guardian ad Litem, John Francis Bistrick, Sr., Plaintiff,

v.

The UNIVERSITY OF SOUTH CARO-LINA, Defendant.

Civ. A. No. 70–905.

United States District Court,
D. South Carolina,
Columbia Division.

Heard Dec. 17, 1970.

Decided Feb. 23, 1971.

See also, D.C., 319 F.Supp. 193.

Patrick E. Treacy, Columbia, S. C., for plaintiff.

Michael W. Tighe, Asst. Atty. Gen. of South Carolina, Columbia, S. C., for defendant.

ROBERT W. HEMPHILL, District Judge.

Defendant moves for summary judgment under Rule 56, Federal Rules of Civil Procedure. The motion is supported by (1) an affidavit of the Secretary of the Board of Trustees of the University of South Carolina; (2) letters of various personnel involved in the controversy; (3) the minutes of a hearing (In Re: John Bistrick) held before the Board of Trustees of the University of South Carolina on August 25, 1970, (4) certain exhibits attached to pleadings, or introduced without objection; and (5) contents of the official file in the case.

This action was commenced October 12, 1970, upon the filing of the Complaint [1], which seeks: (1) an Order requiring the University of South Carolina to readmit John F. Bistrick, Jr., as a student, (2) a declaratory judgment "defining his rights, duties and responsibilities under the annexed rules and regulations in the light of his constitutional guarantees and his rights under the 1871 Civil Rights Act," and, (3) other relief. Former student Bistrick was permanently suspended as a result of a hearing held before the University Board of Trustees on August 25, 1970. Defendant filed its Answer on or about November 2, 1970, issued a request under Rule 36 that the plaintiff admit the genuineness of the transcript of proceedings held before the full Board of Trustees on August 25, 1970, a copy of which was attached to the request, and thereafter, on December 10, 1970, served and filed its Motion for Summary Judgment in this case.

The Answer sets forth defendant's claim as to the factual background, which differs in some particulars from the plaintiff's account as set forth in the Complaint, and, in general, denies that Bistrick, Jr., has been denied any rights guaranteed to him by the Constitution of the United States, the laws of South Carolina, or the rules and regulations of the University. The Motion for Summary Judgment relies on the second defense of the Answer, in which it is al-

---

1. The Complaint unequivocally negates, per se, any attempt on the part of counsel to comply with Rule 8, Fed.R.Civ.P. It is replete with statements of evidence and argument. Perhaps, in these days of court "liberality", when one travels on the overloaded vehicle of Civil Rights, counsel can disregard *any* rule.

leged that any errors or omissions of constitutional import which might have occurred prior to August 25, 1970, were cured by the *de novo* hearing before the full Board of Trustees on that date. Defendant does not admit that any right guaranteed to Bistrick, Jr., was denied him at any stage; rather, the defendant takes the position that, for purposes of the motion, if any rights were denied Bistrick, Jr., such denial is irrelevant as a matter of law, and was cured by the August 25, 1970, *de novo* hearing; further, that as a result of the complete cure of the deficiencies, if any, the defendant is entitled to judgment as a matter of law under Rule 56.

The basic facts surrounding this controversy are uncontroverted. On the afternoon of May 7, 1970, Bistrick, Jr., was present in the Russell House, together with other students and nonstudents. Upon being ordered to leave the building, he declined to do so, even though he was advised that if he did not vacate the building he would be suspended from the University. Thereafter, he was advised by University officials that those who had not vacated the building were suspended and would be arrested if they did not depart. Subsequently, defendant and approximately 40 others were arrested and removed from the Russell House by police officers. Those among the group who were students were subsequently advised in writing of their suspension, and that they would be afforded a hearing on or about May 11, 1970.

The University has stated its intention to offer evidence at the ultimate trial of this matter, if the motion is denied, to establish that persons unknown had agreed to and did, on May 7, 1970, take over the Russell House [2] and that such persons ousted from that building the officials charged with its custody and control, secured certain of the doors, and materially and substantially interferred with the normal functions of the building. The University determined that it

was necessary to remove all students and non-students from the building in order to re-establish University control over the building. There is no evidence establishing that Bistrick, Jr., locked the doors, ordered the administrators to leave or was otherwise involved, except to the extent that he refused to vacate the building when ordered to do so as a part of what the University contends was a reasonable method of reasserting its control over its building. It is this failure to depart which the University has maintained constitutes interference with the normal operations of the Russell House by preventing the administration from re-establishing its control over the building.

It is undisputed that Mr. Bistrick appeared before a Special Hearing Committee established by the Board of Trustees of the University (See Exhibit 1 to the Answer) on May 11, 1970, and on June 12, 1970, and that the judgment of the committee was that he be permanently suspended from the University of South Carolina.

Mr. Bistrick was advised by William H. Patterson, Provost of the University of South Carolina and Secretary of the Board of Trustees, by certified letter dated June 16, 1970, that the Special Hearing Committee had determined that he should be permanently suspended from the University as a result of the hearings held on May 11, 1970, and June 12, 1970. He was advised by certified letter dated August 5, 1970, that he could appeal to the Board of Trustees if he indicated his desire to do so on or before August 15, 1970. Copies of this letter were also dispatched to Patrick E. Treacy and Jack F. McGuinn, Mr. Bistrick's counsel. Mr. Bistrick indicated his desire to appeal on August 14, 1970. Thereafter, on August 18, 1970, Mr. Bistrick was advised by letter that his appeal would be heard by the Board of Trustees on August 25, 1970, at 11:00 a. m. in the Board Room of the Admin-

2. A student union building having various facilities for student meetings, meals, school supplies, as well as a campus post office.

istration Building of the University of South Carolina, at Columbia, South Carolina, and that the proceedings before the Board of Trustees would be *de novo* rather than upon the record of any proceedings theretofore held. (Affidavit of William H. Patterson, dated November 9, 1970, attached to Motion for Summary Judgment.)

By the sheet summarizing the position of the University, enclosed with the August 18, 1970, letter (attached to the transcript as Exhibit 4), Mr. Bistrick was advised that his conduct was characterized as interference with the normal operation of the Russell House, and that the University considered Section 16–551 [3] of the South Carolina Code of Laws when drafting the charge. Additionally, the August 18, 1970, letter included a proposed written stipulation describing with particularity the facts which the University would seek to establish, by stipulation or otherwise, at the hearing.

At 11:15 a. m., August 25, 1970, Mr. Bistrick's hearing before the full Board of Trustees commenced, with Mr. Bistrick present, together with his father and his attorney, Patrick E. Treacy. A full transcript of this proceeding is a part of the record before this court. Counsel for Bistrick refused to enter into the stipulation posed in the August 18, 1970 letter from William H. Patterson. The Board of Trustees received into evidence statements of various Russell House officials dated May 8, 1970, May 19, 1970, and June 10, 1970, which in general described the events of May 7, 1970, but did not specifically mention Mr. Bistrick. In addition, the University heard testimony from J. J. Nix, As-

sistant Dean of Men who testified that he was present at the Russell House on the afternoon of May 7, 1970, and that he had read a statement at 3:45 p. m. on that date asking those within the building to leave it. He testified as to the general conditions prevailing at the Russell House on May 7, 1970, and that he observed John F. Bistrick, Jr., sitting in front of the information desk at the Russell House.

He also testified that he read an announcement over the building's public address system which included the following language: "You are asked to cease and leave these premises immediately. If you do not do so, you will be temporarily suspended from the University and the reason therefor will be immediately reported to the University's Committee on discipline for appropriate action." At approximately 4:00 p. m. Dean Nix read another statement advising those who had not left that they were suspended and that if they did not immediately vacate the building, they would be evicted as trespassers. Dean Nix was present on at least two occasions when law enforcement officials asked those students to leave who had not departed, in the presence of Mr. Bistrick who declined to leave and was arrested. Dean Nix was cross-examined by Mr. Treacy on behalf of Mr. Bistrick.

The assembled members of the Board of Trustees heard testimony from SLED Agent Walter G. Powell who testified that he arrived at the Russell House at approximately 5:10 p. m. with other police officers and that at approximately 5:20 p. m. he observed a group of people,

---

3. Section 16–551, S.C.Code 1962 Annotated reads:

   *Disturbing school.*—It shall be unlawful:

   (1) For any person wilfully or unnecessarily (a) to interfere with or disturb in any way or in any place the students or teachers of any school or college in this State, (b) to loiter about such school or college premises or (c) to act in an obnoxious manner thereon; or (2) For any person to (a) enter upon

   any such school or college premises or (b) loiter around the premises, except on business, without the permission of the principal or president in charge.

   Any person violating any of the provisions of this section shall be guilty of a misdemeanor and, on conviction thereof, shall pay a fine of not less than ten dollars nor more than one hundred dollars or be imprisoned in the county jail for not less than ten days nor more than thirty days.

including Mr. Bistrick, seated within the Russell House lobby.

They were asked to leave by police officers and told that they would be arrested if they did not leave. In a few minutes they were again asked to leave by Chief J. P. Strom of the State Law Enforcement Division, and those who did not leave, including Bistrick, were arrested and removed.

Mr. Bistrick was advised by counsel to the Board that Mr. Bistrick could testify before the Board if he wished. He declined to testify or to present any other evidence, except the unsworn statement by his father and an argument by his attorney.

Following the hearing, Mr. Bistrick was advised by certified letter dated August 28, 1970, that the Board of Trustees had decided to confirm the permanent suspension originally, imposed by the Special Hearing Committee.

## AS TO PLAINTIFF'S FIRST AMENDMENT RIGHTS [4]

The Preamble to the "Statement of Student Rights and Freedoms Within the Academic Community" [5] reflects the general policy of the University:

Academic institutions exist for the transmission of knowledge, the pursuit of truth, the development of students, and the general well-being of society. Free inquiry and free expression are indispensable to the attainment of these goals. As members of the academic community, students should be encouraged to develop the capacity for critical judgment and to engage in a sustained and independent search for truth. Institutional procedures for achieving these purposes may vary from campus to campus, but the minimal standards of academic free-

dom of students outlined below are essential to any community of scholars.

Freedom to teach and freedom to learn are inseparable facets of academic freedom. The freedom to learn depends upon appropriate opportunities and conditions in the classroom, on the campus and in the larger community. Students should exercise their freedom with responsibility.

The responsibility to secure and to respect general conditions conducive to the freedom to learn is shared by all members of the academic community. The University has a duty to develop policies and procedures which provide and safeguard this freedom. Such policies and procedures should be developed within the framework of general standards with the broadest possible participation of the members of the academic community. The purpose of this statement is to enumerate the essential provisions for student freedom to learn.

The Right of Peaceable Assembly is re-guaranteed in the Student Handbook: [6]

The University is attended by a very large number of students who seek its educational advantages. It recognizes and follows the principle that in addition to their general rights, its students have rights as students, the free exercise of which it strives to assure to them. These include peaceable assembly, freedom of opinion, and freedom of speech. They also include freedom to engage in the normal educational and institutional processes of the University. It is the duty of the University to see that the rights of all students are

---

4. At the hearing before this court neither party argued First Amendment rights. This court feels compelled to discuss the same under the facts before it.

5. Page 19 of Student Rules and Regulations 1969/1970 The University of South Carolina.

6. Page 32 of Student Rules and Regulations 1969/1970 The University of South Carolina.

respected on its campus and to take all proper measures to see that no one connected ·with the University as a student or otherwise interferes with their free exercise. To the limit of its resources the University will protect the rights of its students on its campus, and in the event of conduct intended or reasonably calculated to interfere with or prevent the free exercise thereof, including physical obstruction or interference, interference by noise, and actions which offend or outrage normal sensibilities, it will invoke appropriate legal and disciplinary sanctions.

The following regulations implement the above:

a. Subject only to prior reservations, a student organization or group of students desiring to assemble on the campus shall be entitled to reserve an appropriate time and place on campus for their assembly, provided the assembly location is not such that at the time for which requested the proposed assembly will interfere with the normal and regular programs of the University or the normal flow of campus traffic, vehicular or pedestrian. Applications for reservations shall be made in writing at least twenty-four (24) hours before the proposed assembly to the Vice President for Student Affairs.

The precise nature of the private interest involved in this case is the right to remain at a public institution of higher learning in which plaintiff was a student in good standing. Education is basic to our civilized society. Without sufficient education plaintiff will not likely be able to earn an adequate livelihood, enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of a good citizen. Dixon v. Alabama State Board of Education, 294 F.2d 150, 157 (5th Cir. 1961).

■ At the threshold this court is reminded that a student does not abandon his constitutional right to due process upon his registration at the college of his choice.[7] This court is not concerned whether his attendance is classified as a "privilege" or a "right." Indeed, it is each and both! Coupled with the privilege-right is the privilege-right of every other student, and civilization, made possible by rules and discipline in the world of reality outside the "hallowed halls of dear old alma mater," cannot reflect its hopeful updating of human behavior on the campus without rules and discipline.[8]

■ The First Amendment[9] loses none of its awesome force when taken to the campuses of America. Students and teachers have every right to freedom of expression. Tinker v. Des Moines, Independent Community School Dist., supra. The problem before this court arises where plaintiff, in his claimed exercise of First Amendment rights, collides with the rules (efforts) of school authorities. This court must, then, apply the First Amendment rights of plaintiff in light of the special characteristics of the school environment. *Tinker,* supra.

The collision in the case before us occurred between expression (plaintiff professes to have sought expression) and action. A delineation in the right to express and the right to act is discussed in Cox v. Louisiana, 379 U.S. 536, 555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471, 484 (1965) where the right to cordon off a

7. Tinker v. Des Moines (1969), Independent Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; Meyer v. Nebraska (1923), 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042.

8. Epperson v. Arkansas (1968) 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228.

9. ART. 1 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

street or public or private building is discussed:

> From these decisions certain clear principles emerge. The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, on entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations. See Lovell v. City of Griffin, supra, 303 U.S. [444] at 451, 58 S.Ct. 666, at 668 [82 L.Ed. 949 at 953]; Cox v. New Hampshire, supra, 312 U.S. [569] at 574, 61 S.Ct. 762 at 765 [85 L.Ed. 1049 at 1052, 133 A.L.R. 1396]; Schneider v. State of New Jersey, supra, 308 U.S. [147] at 160–161, 60 S.Ct. 146, at 150 [84 L. Ed. 155 at 164]; Cantwell v. Connecticut, supra, 310 U.S. [296] at 306–307, 60 S.Ct. 900, at 904 [84 L.Ed. 1213 at 1219, 128 A.L.R. 1352]; Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834; Poulos v. New Hampshire, supra, 345 U.S. [395] at 405–408, 73 S.Ct. 760, 766–768 [97 L.Ed. 1105 at 1113–1115, 30 A.L.R.2d 987] see also, Edwards v. South Carolina, supra, 372 U.S. [229] at 236, 83 S.Ct. 680, at 683. [9 L.Ed. 2d 697 at 702]

This court, at such low level of authority, does not attempt to interpret *Tinker*, as such. It does hope to apply *Tinker* where applicable, deny application where appropriate. *Cox*, supra, is relied on here in the hope expressed by Professor Charles Alan Wright in the Oliver Wendell Holmes Lectures, delivered at Vanderbilt University School of Law, April, 1969: [10]

> \* \* \*. If that distinction is a workable one, it will carry us a long way in considering particular problems. Expression must be wholly free. Neither the state in general, nor the state university in particular, is free to prohibit any kind of expression because it does not like what is being said. Reasonable and nondiscriminatory regulations of time, place, and manner are the only restrictions that can be put on expression. Action is quite different. It carries no first amendment shield and can be regulated in any way that the public health, safety, morals and welfare require. Pages 1038–1039.

This court adopts the interpretation of Professor Wright [11]

> [T]hat the first amendment imposes on the state university, fully as much as on the state itself, these three rules: (1) Expression cannot be prohibited because of disagreement with or dislike for its contents. (2) Expression is subject to reasonable and nondiscriminatory regulations of time, place, and manner. (3) Expression can be

10. Vol. XXII, No. 5 Vanderbilt Law Review (October 1969) p. 1038.

11. Ibid.—1043.

prohibited if it takes the form of action that materially and substantially interferes with the normal activities of the institution or invades the rights of others.

This court has previously recognized the First Amendment Rights of Students in South Carolina Colleges in Hammond v. South Carolina State College (D.C. 1967), 272 F.Supp. 947, especially the rights to peaceable assembly and expression, citing Bridges v. State of California (1941), 314 U.S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192 and Schneider v. State of New Jersey (1939) 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155, and other authority from the highest tribunal in the land. In *Hammond*, however, there was no confrontation between expression and action such as here exists.

Sill v. Pennsylvania State University, 318 F.Supp. 608, 615 (M.D.Pa.1970), and Farrell v. Joel [12], 437 F.2d 160 (2nd Cir. 1971), support the application of *Tinker* to the First Amendment Rights of Students and the right and responsibility of states and school administrators to have comprehensive authority, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools. Both rely on *Wright* (Vanderbilt Law Review) supra.

■ Focussing the spotlight of truth on the facts before this court, one finds that nowhere in the entire proceeding was Bistrick denied the right to speak out, nor was even the slightest effort made to deny him *peaceable* assembly or his right of expression. Bistrick was undeniably involved in a "takeover" of a campus building, where a minority group of dissidents sought to force University officialdom, and other students, from the building and prevent the use of the building for ordinary scheduled and expected purposes. Whether a Kent State conflagration would have resulted is not apparent here, but the fact remains that the form of expression employed falls within the third category described by Wright and took the form of action that materially and substantially interfered with the normal activities of the University of South Carolina and invaded the rights and privileges of others.[13]

Defendant was therefore within its authority in taking the action taken on May 7, insofar as the procedure employed in the Russell House is involved.

## AS TO DUE PROCESS

The plaintiff's principal complaint seems to be that the disciplinary procedure established by the University for consideration of alleged student misconduct was in his case abandoned. The handbook of student regulations provided:

c. The Discipline Committee

(1) the committee should include faculty members and student members. No member of the committee who is otherwise interested in the case should sit in judgment during the proceedings.

(2) The student should be informed in writing, of the reasons for the proposed disciplinary action with sufficient particularity, and in sufficient time, to ensure opportunity to prepare for the hearing.

(3) The student appearing before the committee should have the right to be assisted in his defense by an advisor of his choice.

12. From Chief Judge Lumbard's concurring opinion one excerpts:

However, it would seem appropriate to suggest to the district judges that perhaps one way of encouraging plaintiffs to seek their remedies in a state court, where they more properly belong and where, as in this case, it is conceded that they could have gone, would be to deny a temporary restraining order and refuse to give these matters any preference, to which they are clearly not entitled. That relief may be available in the state courts is enough reason to deny temporary relief in federal courts, since failure to do so could not cause irreparable harm if another forum is also available.

13. Enrollment is 12–15000 students.

(4) The burden of proof should rest upon the officials bringing the charge.

(5) The student should be given the opportunity to testify and to present evidence and witnesses. He should have an opportunity to hear and question adverse witnesses. In no case should the committee consider statements against him unless he has been advised of their content and of the names of those who made them, and unless he has been given an opportunity to refute unfavorable inferences which might otherwise be drawn.

(6) All matters upon which the decision may be based must be introduced into evidence at the proceeding before the committee. The decision should be based solely upon such matters. Improperly acquired evidence should not be admitted.

(7) There should be, where possible, a verbatim record, such as a tape recording, of the hearing.

(8) In the event that the student is disciplined other than by the regularly constituted Discipline Committee, he shall have the right to a complete hearing before the Discipline Committee. The decision of the Discipline Committee shall be final, subject to the student's right of appeal to the President of the University and to the Board of Trustees of the University. Page 25.

It was determined that the cases of the plaintiff herein and of the others involved in the "take over" of the Russell House should be heard by a special committee established by the board of trustees. Mr. Bistrick also complains of certain procedural deficiencies at the hearings before the special committee which resulted in a denial of due process and were in violation of the above regulation.

■■ While it is crystal clear that one does not abandon his constitutional right to due process of the law by matriculating at an institution of higher learning, it is equally certain that no particular model of student disciplinary procedure is required, so long as that employed by a university is "reasonably calculated to be fair to the student involved and to lead to a reliable determination of the issues." Wright, The Constitution of the Campus, 22 Vand.L. Rev. 1060 (1969).

■ Professor Wright, after a thorough analysis of the decisions in the field, has concluded that collegiate disciplinary procedures which meet four requirements of fundamental fairness are constitutionally adequate. The record in this case indicates that each of these requirements was fully met in the *de novo* hearing before the trustees on August 28.

First, the student must be advised, in advance of the hearing, of the grounds for the charge. *Wright*, p. 1072. The notice should contain a statement of the specific ground and charges, which, if proven, would justify action by the disciplinary authority. Dixon v. Alabama State Board of Education, 294 F.2d 150, 158 (5th Cir. 1961).

Second, while the student may not be entitled to confront the witnesses against him, he is entitled to their names and a summary of the testimony each has given. *Wright*, p. 1072. Accord: Dixon v. Alabama State Board of Education, supra at 159.

Third, the student has a right to be heard in his own defense, and to present such evidence on his behalf as he might desire the disciplinary authority to hear. *Wright*, p. 1072. Wright indicates, on p. 1073, that the right might not extend to actual appearance before the ultimate legal authority to administer discipline.

Fourth, and finally, no serious disciplinary action can be taken unless it is based upon substantial evidence. *Wright*, at 1073.

■ The University contends that Mr. Bistrick was afforded these four funda-

mental guarantees and, in addition, benefited from certain procedural safeguards not generally recognized as being essential to administrative due process. If this contention is based upon undisputed facts and is correct as a matter of law, the defendant is entitled to judgment under Rule 56.

In compliance with Professor Wright's first requirement that the student to be disciplined be advised in writing of the grounds and basis of the charge against him, the record reflects that Mr. Bistrick was informed by letter dated June 16, 1970, that the Special Hearing Committee had found him guilty of the charge of "interfering with the normal operation of a University building, namely, Russell House." By certified letter dated August 5, 1970, Mr. Bistrick was advised that the board of trustees was prepared to hear appeals from the Special Hearing Committee which found that Mr. Bistrick was involved in "interfering with the normal operations of the Russell House." At Mr. Bistrick's request he was granted an appeal from the finding and was advised by an enclosure to the letter dated August 18, 1970, that at the *de novo* hearing scheduled August 25, 1970, the administration would take the position that Mr. Bistrick's conduct, described in a proposed written stipulation justified the University's position before the board of trustees that Mr. Bistrick's conduct constituted interference with the normal operation of a University building, to wit, the Russell House. In the proposed stipulation, which is a part of Exhibit 3 of the transcript, the specific evidence which the University offered to stipulate into the record was presented to Mr. Bistrick and, inasmuch as he declined to stipulate to these facts at the August 25, 1970 hearing, they were established by other evidence. There can be little doubt that Mr. Bistrick was fully advised of the grounds of the charge against him by all the correspondence which he had received prior to August 25, 1970, and, in particular, the letter dated August 18, 1970, with its enclosures.

Wright says that the second fundamental requirement of administrative due process is that the student to be disciplined be informed of the names of the witnesses against him and be furnished a summary of the testimony of each. This requirement seems to be in lieu of a requirement that the student be allowed to confront and cross-examine his witnesses. *Wright*, at p. 1072 and *Dixon*, supra, 294 F.2d at 159. In the instant case, those witnesses who testified to conduct directly attributed to Mr. Bistrick did so in his presence and were subjected to cross-examination by his counsel. In addition to the oral testimony received by the board of trustees, there were admitted as Exhibits 5, 6 and 7 statements of University employees which described the general conditions prevailing in the Russell House on May 7, 1970, but which did not mention Mr. Bistrick by name. These were admitted into evidence at the hearing, and Mr. Bistrick's counsel was given an opportunity to examine them. Moreover, the stipulation which is attached to Exhibit 3 of the transcript advised Mr. Bistrick of the basic facts which the University Administration considered necessary and essential to its case, and which it subsequently adduced evidence to establish. Thus, it would seem that Mr. Bistrick was not only advised of the names of the witnesses and the general evidence against him, but also given an opportunity to confront and cross-examine those witnesses whose testimony related directly to him.

Thirdly, it is uncontroverted that Mr. Bistrick was present at the hearing on August 25, 1970 and that Mr. Bistrick was given an opportunity to testify and that Mr. Bistrick was informed that he could present any evidence which he desired the Board to consider. The record will reveal that Mr. Bistrick elected not to testify before the Board of Trustees but that his father did make an unsworn statement on his behalf and that his counsel made an oral argument.

Fourthly and finally, Professor Wright expresses the opinion that serious dis-

ciplinary action should be based upon substantial evidence. In that regard, the transcript reveals, and the pleadings establish, that Mr. Bistrick was present at the Russell House on May 7, 1970, and that, together with some 40 other persons, he declined to depart when asked to do so by University officials and police officers. Upon his repeated refusal to depart, Mr. Bistrick was ultimately arrested, evicted from the building, and charged with trespassing. The University, in the exercise of its discretion had determined that it was necessary to ask all persons to leave the building, in order to re-establish the control over its building which had been wrested from it by persons unknown. This determination was not clearly arbitrary or capricious. The plaintiff's refusal to obey the lawful directions of these University officials charged with the custody and protection of those students and property which comprise the University of South Carolina justified the disciplinary action finally taken by the Board on August 25, 1970.

In addition to the minimal guarantees which Professor Wright says are essential to due process, it has been suggested that fairness might require that a student facing disciplinary action be entitled to representation by an attorney, to assistance at any hearing by adult relatives and friends, and to confront and cross-examine witnesses against him. In the instant case, Mr. Bistrick was present at his hearing on August 25, 1970, accompanied by his father (who was heard by the Board) and by his attorney, who presented an active and vigorous defense. In addition, Mr. Bistrick's attorney cross-examined all witnesses who testified before the Board, and a full transcript of the proceeding has been made and furnished to counsel in this case.

■ The defendant argues that even if the hearings before the Special Committee on May 11 and June 12 did not meet the requirements of due process, that deficiency was cured by the *de novo* hearing in August.

There is abundant authority for the proposition that a trial *de novo* cures any deficiencies in previous judicial proceedings. Bowman v. Kansas City, 233 S.W.2d 26 (Mo.1950); Dundee Realty Co. v. Omaha, 144 Neb. 448, 13 N.W.2d 634 (1944); Maryland Cas. Co. v. Dobbin, 232 Mo.App. 557, 108 S.W.2d 166 (1937); Stockton v. Rainwater, 289 S.W. 467 (Ark.1927); Scott v. Price Bros. Co., 207 Iowa 191, 217 N.W. 75 (1927); Crick v. Paull, 287 Pa. 431, 135 A. 103 (1926); Dawkins v. Petteys, 121 Ark. 498, 181 S.W. 901 (Ark.1915); Beyer v. Schlenker, 181 S.W. 69 (Mo.1915); and Sweet v. Gilmore, 52 S.C. 530, 30 S.E. 395 (1898). Also see 5 C.J.S. Appeal and Error § 1528. Indeed, there is a decision squarely on point, in which a federal court noted that the *de novo* hearing was preferable to any other form of appeal from collegiate disciplinary action. Zanders v. Louisiana State Board of Education, 281 F.Supp. 747, 868 (W.D.La. 1968). In that case the court found that the *de novo* hearing before the Board of Education satisfied the requirements of due process—hereinbefore discussed— and denied relief, despite the fact that the earlier hearings from which appeals were taken to the Board were not adequate. *Zanders* at p. 767.

The court concludes that there can be no question but that the plaintiff was afforded procedural due process by the *de novo* hearing and that such adequate hearing cures earlier procedural deficiencies.

■ The plaintiff also complains that only a minority of those in pari delicti with him were permanently suspended while others received lesser punishment. The action of the defendant was not unreasonable and the plaintiff will not be heard to complain of lesser sanctions awarded his fellows.

## CONCLUSION

Bistrick was given all the constitutional guarantees to which he was entitled. He was accorded due process.

There remains, therefore, no genuine issue of fact for this court's consideration.

Defendant's motion for summary judgment is granted.

And it is so ordered.