**Anthony HERMAN, Plaintiff,**

v.

**UNIVERSITY OF SOUTH CAROLINA et al., Defendants.**

**Civ. A. No. 70-1133.**

United States District Court,
D. South Carolina,
Columbia Division.

Sept. 9, 1971.

Laughlin McDonald, Columbia, S. C., for plaintiff.

Alexander S. Macaulay, Asst. Atty. Gen., Columbia, S. C. and Phillip M. Grier, Staff Counsel, Div. of Student Affairs, Univ. of South Carolina, Columbia, S. C., for defendants.

## ORDER

CHAPMAN, District Judge.

The facts in this case are practically identical to those in Bistrick v. University of South Carolina, 324 F.Supp. 942 (D.C.S.C.1971). Plaintiff was permanently suspended as a student from the University of South Carolina by action of its Board of Trustees on August 25, 1970, and has brought this action against the University of South Carolina, its trustees, individually and as members of the Board, and against Mike Spears (President of the Student Body), individually and as a member of the Board of Trustees.

Complaint was filed on December 21, 1970 and seeks: (1) an Order of the Court taking jurisdiction of the case and declaring the respective rights and legal relations of the parties; (2) an award to the plaintiff in the sum of $250,000 as damages; (3) a preliminary and permanent injunction reinstating the plaintiff as a student at the University of South Carolina.

At the time the suit was commenced it was brought on behalf of the minor plaintiff by a guardian ad litem. The plaintiff has now become of age and the guardian ad litem has died. The Court has given permission for the plaintiff, Anthony Herman, to proceed with the case in his individual name.

On February 3, 1971, this Court dismissed the actions as to the defendant trustees, individually, except as to Mike Spears, on the ground that there had not been proper service of process upon them. The matter is now before the Court upon motion of both parties for summary judgment under Rule 56.

The plaintiff has also moved to amend his complaint by alleging certain occurrences relating to his petition for readmission to the University under date of March 22, 1971, and the hearing of March 29, 1971, by the Board of Trustees on this petition. This Court does not believe that these proposed allegations change the basic facts surrounding this case, and they do not create any material issue of fact and are irrelevant to the basic question to be decided in this case. The ultimate issue is the constitutional sufficiency of the procedures employed by the University of South Carolina resulting in the plaintiff's permanent suspension. Since both parties have moved for summary judgment and there is no genuine issue of material fact, the case can be decided as a matter of law.

On the afternoon of May 7, 1970, the plaintiff was present in the Russell House (Student Union Building) at the University of South Carolina in Columbia, together with other students and non-students. During this afternoon certain of these students and non-students "took over" the building, ordered the University employees charged with operation and control of said building to leave and made efforts to prevent entry into the building by fastening and tying shut the doors. There is no contention that the plaintiff was personally involved in removing the custodians and employees from the building or attempting to fasten the doors, but by his admission, he was seated on the floor in the lobby of the building near the Information Desk. Upon being ordered to leave the building by the Assistant Dean of Men of the University, the plaintiff declined to do so, even though he was advised that if he did not vacate the building, he would be suspended from the University. Thereafter he was advised by Dean Nix that those who did not vacate the building were suspended and would be arrested. The plaintiff still refused to leave the building and subsequently local law enforcement officers arrived and asked those remaining to vacate the building. The plaintiff, together with approximately 40 other students and non-students refused this request and were arrested and removed from the Russell House by the police officers.

On May 8, 1970, the plaintiff was advised by letter of L. Eugene Cooper, Dean of Men at the University, that he was temporarily suspended, confirming the oral suspension at the Russell House on May 7, 1970; said letter further advised the plaintiff that the temporary suspension "is in effect until your appearance before a hearing committee." On the same day, May 8, 1970, the Executive Committee of the Board of Trustees at the University of South Carolina met and passed a resolution creating a special committee to hear students suspended for activities occurring on May 7, 1970. This resolution provided that students under suspension should be heard by a combined University-Board of Trustees Committee composed of the following: Members of the Board's Executive Committee; The Chairmen of the Board's Standing Committees; The Chairmen of the Board's Faculty and Student Liaison Committees; The Chairmen of the University's Faculty Advisory Committee and Committee on Discipline; the President of the Student Body; Presiding Officer of the Student Senate. This resolution also set Monday, May 11, 1970, as the date to commence such hearings. On May 8, 1970, L. Eugene Cooper, Dean of Men, advised Anthony Herman, plaintiff herein, that the charges against

him would be heard at 5:15 P.M. on May 11, 1970, in the Board Room, Second Floor, Administration Building. This letter also advised the plaintiff that he was charged with "interferring with the normal operation of a University building, namely Russell House", and further stated "you will be interested to know that you have the right to representation and if you desire, you may call any witnesses you wish in your behalf, and in addition, you have the right to be confronted with and question witnesses appearing against you." This hearing was postponed until June 12, 1970, and plaintiff and his father received a letter dated May 29, 1970, from C. H. Witten, Vice-President of the University, advising them of the charge against plaintiff, the time and place of the hearing and the plaintiff's right to representation, to call witnesses and to confront and question witnesses appearing against him. The plaintiff appeared before the Committee on June 12, 1970, in the company of his mother. He was again advised of the charges against him, availed himself of the right to make a statement before the Committee, and presented evidence for the Committee's consideration.

On June 16, 1970, plaintiff was advised in writing by William H. Patterson, Secretary to the Board of Trustees, that he had been permanently suspended from the University. Thereafter on August 5, 1970, plaintiff received a certified letter from Mr. Patterson notifying him that the Board of Trustees would hear appeals from the decisions of the Special Hearing Committee of the University, and if plaintiff desired to appeal, his request for a hearing on appeal must be filed with the Secretary of the Board on or before August 15, 1970. The plaintiff indicated his desire for a hearing before the Board of Trustees and at 2:50 P.M. Tuesday, August 25, 1970, he appeared before the Board and was represented by Hyman Rubin, a recent law graduate. Prior to this hearing plaintiff was written another letter by the Secretary to the Board of Trustees under date of August 18, 1970, forward-

ing a "Summary of Facts" or stipulations regarding the occurrences of May 7, 1970, requesting that this summary be reviewed and if plaintiff agreed with such summary it would become a stipulation so that no further evidence as to such facts would be offered.

This letter also contained the following statement:

"Actions taken by the Special Hearing Committee were in pursuance of positions clearly stated by the University in the Student Rules and Regulations 1969/70 (copy enclosed), Chapter IV, Sections 1 and 4; and were taken with the knowledge of the provisions of Section 16–551 of the 1962 Code of Laws of South Carolina as amended."

At the hearing the stipulation as to facts, previously submitted to the plaintiff, was adopted with slight amendments. This amended stipulation was agreed to as follows:

"STIPULATION

(1) On the afternoon of May 7, 1970, a number of persons including Mr. Herman occupied the Russell House for a brief period of time.

(2) The University called upon the persons aforesaid to leave the premises immediately, speaking by way of a statement read over the public address system of the Union Building by J. J. Nix, Assistant Dean of Men. By this statement, the University indicated that those students failing to vacate the premises would be temporarily suspended. A number of those present then left the building.

(3) Shortly thereafter, Dean Nix read another statement to those then remaining in the building to the effect that they were temporarily suspended. A number of those present then left the building.

(4) Sometime later, law enforcement officers arrived and those remaining in the building were asked by them to vacate the building. A number of persons left the building at this time. Those who did not, some 41 in num-

ber, were taken into custody, escorted from the building, and placed in buses.

(5) The appellant was among the students who were arrested on May 7, 1970."

In addition to the stipulation, the Board of Trustees at its hearing on August 25, 1970, received into evidence statements from various Russell House officials, which in general described the events of May 7, 1970. None of these statements specifically mention Mr. Herman, the plaintiff, but he testified that he was present in the Russell House at the time in question and was ultimately arrested, while sitting on the floor in front of the Information Desk with a group of people. He further testified that he had been requested more than once to vacate the building by a recognized official of the University and that he heard the announcement that he was violating a rule of the University and that he would be suspended. He also testified that he heard the police come in and announce over the loud speaker that he would be arrested if he did not leave the building. Mr. Herman's representative, Mr. Hyman Rubin, made several statements and arguments into the record and actively participated in the proceeding. Following the hearing, Mr. Rubin was advised by certified letter dated August 28, 1970, that the Board of Trustees had confirmed the permanent suspension originally imposed upon him by the Special Hearing Committee.

The motion for summary judgment by both parties, is supported by (1) an affidavit of the Secretary of the Board of Trustees of the University of South Carolina; (2) letters of various personnel involved in the controversy; (3) minutes of a hearing (in re: Anthony Herman) held before the Board of Trustees of the University of South Carolina on August 25, 1970; (4) certain exhibits attached to the pleadings, or introduced without objection (affidavit of plaintiff regarding petition for readmission to the University of South Carolina and the hearing held on March 27, 1970, before the Board of Trustees, together with copy of the letter from Laughlin McDonald, his present attorney, to the Secretary of the Board and letter from Secretary of the Board to Mr. Herman advising that the Board has refused his petition for readmission).

■■■■ In *Bistrick* the Court stated the basic concepts that a student does not abandon his Constitutional rights upon his registration into college, the First Amendment loses none of its awesome force when taken to the campuses of America, and that the right of students and teachers to freedom of expression is preserved. However, the Court then pointed out the difference between freedom of expression and expression which takes the form of action that materially and substantially interferes with the normal activities of the institution or invades the rights of others. The Court stated the four requirements that are necessary to preserve due process and fairness in handling campus disciplinary procedures. These four requirements are gathered from the very learned lectures given by Professor Charles Alan Wright at Vanderbilt University Law School in April 1969 and found in 22 Vand.L.Rev. 1060. Professor Wright's conclusions are drawn after an exhaustive study of the decisions of courts throughout the land in applying constitutional law to the rights of students on today's campuses. These four safeguards to protect the students' rights are as follows:

1. The student must be advised, in advance of the hearing, the grounds of the charges against him.

2. He is entitled to the names and a summary of the testimony of witnesses to be used against him, although he may not be necessarily entitled to be confronted by the witnesses at the hearing.

3. The student has a right to be heard in his own defense and to be present and present evidence on his behalf, although Wright indicates that this right does not necessarily extend to the actual appearance before the ultimate legal authority to administer discipline.

4. No serious disciplinary action can be taken unless it is based upon substantial evidence.

█ The evidence against the plaintiff and the action taken by the Board are identical to those in *Bistrick,* and it is unnecessary to go into detail as to how each of the four safeguards has been satisfied, since this has already been spelled out by Judge Hemphill in *Bistrick.* It is the conclusion of this Court that plaintiff has not been denied due process by the disciplinary procedure established by the University and used in handling his case.

█ Although the major legal points raised by plaintiff have been covered by the decision in *Bistrick,* the plaintiff raises certain new questions in his action. He asserts that the rules and regulations of the University are vague, overly broad and that at the time of his suspension and arrest plaintiff was not violating any known, printed or published rule of the University. Student Rules and Regulations 1969/70 of the University of South Carolina, page 32, provides as follows:

"The University is attended by a very large number of students who seek its educational advantages. It recognizes and follows the principle that in addition to their general rights, its students have rights as students, the free exercise of which it strives to assure to them. These include peaceable assembly, freedom of opinion, and freedom of speech. They also include freedom to engage in the normal educational institutional processes of the University. It is the duty of the University to see that the rights of all students are respected on its campus and to take all proper measures to see that no one connected with the University as a student or otherwise interferes with their free exercise. To the limit of its resources the University will protect the rights of its students on its campus, and in the event of conduct intended or reasonably calculated to interfere with or prevent the free exercise thereof, including physical destruction or inter-ference, interference by noise, and actions which offend or outrage normal sensibilities, it will invoke appropriate legal and disciplinary sanctions."

The regulations thereafter set forth conditions upon which students may reserve and use parts of the campus for the purpose of assembly.

Prior to his hearing before the full Board of Trustees on August 25, 1970, plaintiff was advised that the charge against him "constituted interference with the normal operation of a University building, to wit, the Russell House." The Court finds that the charge against this plaintiff was sufficiently specific to satisfy any requirements of due process. The above quoted rule is clear and easily understood. It is as specific as necessary under the facts in this case. Anyone able to pass the entrance examination to a college should understand the meaning of "interference" as used therein. This is not a regulation so vague and uncertain as to require conduct of a student to be "proper", "acceptable", or "in good taste", and the plaintiff is not charged under that portion of the Regulation covering "Actions Which Offend or Outrage Normal Sensibilities". The charges against the plaintiff are easily contained within the provisions of the Regulation and it does not require a strained interpretation for them to be so included. Differences in age, background, customs and mores between students and the administration of a university could easily cause honest differences as to what type behavior was "proper", "acceptable" or "in good taste". In his Vanderbilt lectures, Professor Wright stresses the need for making rules and regulations as specific and precise as possible, but he admits:

"The Court has not required the criminal statutes be drawn with precision of multiplication tables. Even when First Amendment freedoms are implicated, the forbidden conduct need not be delineated by metes and bounds. No more will be expected of university rules. No less should be tolerated."

It would be impossible for any committee of administration, faculty and students to compose rules and regulations so specific as to cover every possible offense, which the fertile imagination of present day students might conceive or perpetrate.

■ Plaintiff also contends that he should not have been expelled without "having been given a reasoned decision on the merits of his case including findings of fact and conclusions of law showing the nature of his conduct which violated particular rules of the University." The action taken by the Board of Trustees sufficiently protected the rights of the plaintiff by advising him of the grounds of the charge, the nature of the evidence against him, giving him an opportunity to be heard in his own defense and not punishing him except on the basis of substantial evidence. There is no requirement in law or reason that suggests or demands the Board to issue written findings of fact or conclusions of law similar to those required by Rule 52 of the Federal Rules of Civil Procedure.

■ The plaintiff has raised the prohibition against cruel and unusual punishment to prevent his permanent suspension, and he contends that other students involved in this affair were not given the same punishment. He suggests that the University should have adopted the "less intrusive alternative principle" rather than the most drastic form of punishment. These arguments are well answered by Judge Hemphill in *Bistrick* in which he finds that the punishment of permanent suspension given to Bistrick "was not unreasonable and the plaintiff will not be heard to complain of lesser sanctions awarded his fellows".

■ It is further contended by the plaintiff that his hearing before the Board of Trustees did not afford him due process of law because he was questioned regarding his political beliefs and the Board considered his alleged violation of Sections 16–551 and 16–388 of the South Carolina Criminal Code. These

are merely conclusions of the plaintiff. He was asked about his possible membership in two organizations, "Freak" and "Aware", but he refused to answer these questions as being irrelevant but did state that he was not a dues paying member or on the rolls of either organization. While there is nothing in the record to show that the Board was unduly influenced by references to "Freak" or "Aware", and while there is no evidence of the political beliefs, if any, of these two organizations, it was within the prerogative of the Board to ask questions concerning plaintiff's association and membership in various groups. It should be remembered that the Board is charged with the safety of 18,000 students at the University of South Carolina and also responsible for the protection, maintenance and upkeep of the property. Information as to the identity and purposes of organizations active on the campus is vital to the discharge of these responsibilities by trustees. This is particularly true in light of the damage done to the property of other colleges and universities from explosion, arson and riots during the Spring of 1970. Credit for destruction of property in certain areas of the country was openly claimed by some organizations and associations, and it was proper for the Board, in light of all these circumstances, to make these inquiries of plaintiff.

■ Although normal disciplinary procedure under the University Rules required a hearing before a disciplinary committee rather than the Special Committee established by the Board of Trustees, this change in procedure was not such as would deny plaintiff due process of law. See *Bistrick*, supra.

■ Section 16–551 of the South Carolina Code was mentioned in the letter of August 18, 1970, to the plaintiff, but this only indicated that this section of the South Carolina Code, together with the Student Rules and Regulations of the University had been considered in taking action. At the hearing before the Board, questions were asked about plain-

tiff's forfeiture of bond, but the questions and answers do not indicate whether this was under Section 16–551 or 16–388. This Court does not feel that the plaintiff was prejudiced by such references or the questions, particularly in view of the stipulation entered into between the parties showing that the plaintiff was arrested because of his activities at the Russell House. As stated in *Bistrick:*

> "The University, in the exercise of its discretion had determined that it was necessary to ask all persons to leave the building, in order to re-establish the control over its building which had been wrested from it by persons unknown. This determination was not clearly arbitrary or capricious. The plaintiff's refusal to obey the lawful directions of these University officials charged with the custody and protection of those students and property which comprise the University of South Carolina justify the disciplinary action finally taken by the Board on August 25, 1970."

 The plaintiff's violations of the Rules and Regulations of the University was sufficient in and of itself to justify the action taken by the Board. The Constitution does not require the application of all strict rules of evidence to student disciplinary proceedings and there has been no showing that the plaintiff was prejudiced or the Board influenced by references to certain trespass statutes of South Carolina.

 The plaintiff challenges the hearing before the Board of Trustees on August 25, 1970, as not being *de novo,* and asserts that he was denied a fair and impartial hearing because some of the members of the Special Hearing Committee were also members of the Board of Trustees which later heard his appeal, that such members and other members had formed a prior opinion of his guilt, and that he was placed in the additional and unconstitutional position of having to prove his own innocence. The fact that certain members of the Board of Trustees sat on both hearings of the

plaintiff's case does not deny him due process and did not prevent the August 25, 1970, hearing from being *de novo.* In National Labor Relations Board v. Donnelly Garment Co., 330 U.S. 219, 67 S.Ct. 756, 91 L.Ed. 854 (1947), the Supreme Court held that a trial examiner of the Labor Board was under no disqualification by virtue of having previously announced a position regarding an analysis of particular facts which he subsequently had to appraise in a further adjudication. The trial examiner had found that the company had formed a company union and thereafter dominated it. The Eighth Circuit subsequently reversed because of error in excluding certain evidence and the Board assigned the case to the same examiner. The company challenged the proceeding as being biased and not impartial. The unanimous Supreme Court stated:

> "Certainly it is not the rule of judicial administration that, statutory requirements apart, * * * a judge is disqualified from sitting in a retrial because he was reversed on earlier rulings. We find no warrant for imposing upon administrative agencies a stiffer rule, whereby examiners would be disentitled to sit because they ruled strongly against a party at the first hearing."

In Pangburn v. Civil Aeronautics Board, 311 F.2d 349 (1st Cir. 1962) the Court held that it is well settled that a combination of investigative and judicial functions within an agency does not violate due process, and that the plaintiff, who had appealed the suspension of his pilot rating to the Civil Aeronautics Board was not denied due process because the Board had previously investigated the accident and had issued an accident report showing pilot error as the cause thereof.

A similar result came from the case decided by the Ninth Circuit, MacKay v. McAlexander, 268 F.2d 35 (1959) in which the Court held that it was not a violation of due process when the same hearing officer heard plaintiff's deportation case and also heard his application

**234**

for suspension of deportation. The Court stated:

"The unfavorable opinion of a party or witness which a hearing officer or a trial judge may entertain as a result of evidence received in a prior and connected hearing involving that individual is not 'bias' in the invidious sense. It is in effect a judicially-determined finding which may properly influence such officer or judge in a supplemental proceeding involving the penalty or punishment to be assessed, or the grace to be extended. No unfairness or lack of due process was inherent in the fact that the same hearing officer presided at both proceedings."

This reasoning is particularly appropriate to the present case where there is no dispute as to the facts and the Board of Trustees have before it a stipulation of fact. The real question was whether or not the plaintiff had violated the rules and regulations of the University based upon the stipulated facts and what punishment, if any, should be imposed.

Since there remain no genuine issues of fact for the Court's consideration, defendants' motion for summary judgment is granted.

And it is so ordered.