573 A.2d 575

Cheryl BOEHM and Maria Stanik, Appellees,

v.

**UNIVERSITY OF PENNSYLVANIA SCHOOL OF VETERINARY MEDICINE and Edwin J. Andrews, V.M.D. and P.H.D., Appellants.**

Superior Court of Pennsylvania.

Argued Dec. 14, 1989.

Filed April 18, 1990.

Neil J. Hamburg, Philadelphia, for appellants.

George F. Schoener, Jr., Philadelphia, for appellees.

Before BROSKY, WIEAND and JOHNSON, JJ.

WIEAND, Judge:

This is an appeal from an order preliminarily enjoining the School of Veterinary Medicine at the University of Pennsylvania from enforcing disciplinary sanctions levied against two students. After careful review, we reverse.

Cheryl Boehm and Maria Stanik were first year veterinary students at the University of Pennsylvania's School of Veterinary Medicine. Following allegations of misconduct during the taking of examinations, Boehm and Stanik were notified, in April, 1989, that charges had been brought against them for violating the Veterinary School's Code of Student Rights and Academic Integrity ("the Code"). A hearing was held before a panel of three faculty members and two students, after which Boehm and Stanik were found guilty of violating the Code by engaging in "behavior suspicious of and compatible with cheating." The hearing

panel recommended probation, but the Dean of the School, Edwin J. Andrews, directed that Boehm and Stanik be suspended for a period of one year and imposed additional sanctions which were to go into effect when the students returned to classes after suspension. An appeals committee upheld the Dean's sanctions with only slight modification. These sanctions, as modified, were: (1) suspension from the Veterinary School for a period of one year; (2) upon return following suspension, probation during the balance of their matriculation; (3) a condition that during all future examinations, they were to sit apart; and (4) placement of a notation on their transcripts that they had been "found guilty of behavior suspicious of, and compatible with cheating," subject to removal mechanisms allowed by the Code. After these sanctions had been imposed, Boehm and Stanik filed a complaint in equity in the Court of Common Pleas of Philadelphia County in which they sought injunctive relief. They alleged that the school's disciplinary proceedings against them had lacked fundamental fairness and failed to comport with the requirements of the Code. Following a hearing, the trial court granted a preliminary injunction in favor of Boehm and Stanik. The Veterinary School and Dean Andrews filed the instant appeal.

On appeal from an order granting a preliminary injunction, the scope of review is narrow. "In determining the propriety of the entry of an order granting a preliminary injunction, the question is whether there were any apparently reasonable grounds in the record to justify its issuance." *Fischer v. Department of Public Welfare*, 497 Pa. 267, 270, 439 A.2d 1172, 1174 (1982) (footnote omitted). See also: *Willman v. Children's Hospital of Pittsburgh*, 505 Pa. 263, 269, 479 A.2d 452, 454 (1984); *South Fayette Township v. Commonwealth*, 477 Pa. 574, 579, 385 A.2d 344, 347 (1978); *Rollins Protective Services Co. v. Shaffer*, 383 Pa.Super. 598, 600, 557 A.2d 413, 413–414 (1989); *Crozer Chester Medical Center v. May*, 352 Pa.Super. 51, 56, 506 A.2d 1377, 1379 (1986). "On an appeal from a decree granting or denying a preliminary injunction, the appellant has a very

heavy burden to overcome; such a decree will not be interfered with upon appellate review in the absence of a plain abuse of discretion by the court below." *Safeguard Mutual Insurance Co. v. Williams,* 463 Pa. 567, 577–578, 345 A.2d 664, 670 (1975). See also: *McDonald v. Noga,* 393 Pa. 309, 311, 141 A.2d 842, 843 (1958); *Broad & Locust Assoc. v. Locust–Broad Realty Co.,* 318 Pa.Super. 38, 43, 464 A.2d 506, 508 (1983). "Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the Chancellor." *Roberts v. Board of Directors of the School District of Scranton,* 462 Pa. 464, 469, 341 A.2d 475, 478 (1975). See also: *Mazzie v. Commonwealth,* 495 Pa. 128, 133, 432 A.2d 985, 988 (1981); *Bell v. Thornburgh,* 491 Pa. 263, 267, 420 A.2d 443, 445 (1980); *Herman v. Dixon,* 393 Pa. 33, 36, 141 A.2d 576, 577 (1958).

Nevertheless, the essential prerequisites for issuing a preliminary injunction must be met. These have been identified by the Pennsylvania Supreme Court as follows:

"first, that it is necessary to prevent immediate and irreparable harm which could not be compensated by damages; second, that greater injury would result by refusing it than by granting it; and third, that it properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct. *Alabama Binder & Chemical Corp. v. Pennsylvania Industrial Chemical Corp.* [410 Pa. 214, 189 A.2d 180] *supra.* Even more essential, however, is the determination that the activity sought to be restrained is actionable, and that the injunction issued is reasonably suited to abate such activity. And unless the plaintiff's right is clear and the wrong is manifest, a preliminary injunction will not generally be awarded: *Keystone Guild, Inc. v. Pappas,* 399 Pa. 46, 159 A.2d 681 (1960), and *Herman v. Dixon,* 393 Pa. 33, 141 A.2d 576 (1958)."

*John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.,* 471 Pa. 1, 7, 369 A.2d 1164, 1167 (1977), quoting *Albee*

*Homes, Inc. v. Caddie Homes, Inc.,* 417 Pa. 177, 181, 207 A.2d 768, 770–771 (1965). See also: *Valley Forge Historical Society v. Washington Memorial Chapel,* 493 Pa. 491, 500, 426 A.2d 1123, 1128 (1981); *New Castle Orthopedic Assoc. v. Burns,* 481 Pa. 460, 464, 392 A.2d 1383, 1385 (1978); *Bell Fuel Corp. v. Cattolico,* 375 Pa.Super. 238, 245, 544 A.2d 450, 453 (1988).

■ We have diligently examined the record in search of an apparently reasonable basis on which a court could interfere with the right of a private school[1] to impose sanctions for conduct found to be "compatible with cheating" and have found none. We are constrained to conclude, therefore, that it was an abuse of discretion for the trial court to enjoin the school preliminarily from putting into effect the suspension imposed by the Dean.

■ The students contended in the trial court that improprieties in the school's disciplinary proceedings rendered the findings of a hearing panel and the punishment meted out by the Dean fundamentally flawed. Broadly speaking, the law is that the

> right of a student to attend a public or private college or university is subject to the condition that he comply with its scholastic and disciplinary requirements, and the proper college authorities may in the exercise of a broad discretion formulate and enforce reasonable rules and regulations in both respects. The courts will not interfere in the absence of an abuse of such discretion.

14 C.J.S. Colleges and Universities § 26, at 1360 (1939). See also: 15A Am.Jur.2d Colleges and Universities §§ 23 & 26–27 (1976); Annot., Right Of Student To Hearing On Charges Before Suspension Or Expulsion From Educational Institution, 58 A.L.R.2d 903 (1958).

With regard to disciplinary sanctions at state owned colleges and universities, the law is fairly well established. In the landmark decision of *Dixon v. Alabama State Board*

---

1. The appellee-students neither alleged nor proved that the school received state aid to an extent which altered its status as a private school.

*of Education,* 294 F.2d 150 (5th Cir.1961), *cert. denied,* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), the United States Court of Appeals for the Fifth Circuit held "that due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." *Id.* at 158.

> The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education. The nature of the hearing should vary depending upon the circumstances of the particular case. The case before us requires something more than an informal interview with an administrative authority of the college. By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities, might be detrimental to the college's educational atmosphere and impractical to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college. In the instant case, the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies. He should also be given the opportunity to present to the Board, or at least to an administrative official of the college, his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf. If the hearing is not before the Board directly, the results and findings of the hearing should be presented in a report open to the

student's inspection. If these rudimentary elements of fair play are followed in a case of misconduct of this particular type, we feel that the requirements of due process of law will have been fulfilled.

*Id.* at 158–159. See: *Gorman v. University of Rhode Island,* 837 F.2d 7 (1st Cir.1988); *Esteban v. Central Missouri State College,* 415 F.2d 1077 (8th Cir.1969), *cert. denied,* 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970); *Jaska v. Regents of University of Michigan,* 597 F.Supp. 1245 (E.D.Mich.1984), *aff'd,* 787 F.2d 590 (6th Cir.1986); *Herman v. University of South Carolina,* 341 F.Supp. 226 (D.S.C.1971), *aff'd,* 457 F.2d 902 (4th Cir.1972). See also: *Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Jones v. Snead,* 431 F.2d 1115 (8th Cir.1970); *Wasson v. Trowbridge,* 382 F.2d 807 (2d Cir.1967); *Barker v. Hardway,* 283 F.Supp. 228 (S.D.W.Va.1968), *aff'd,* 399 F.2d 638 (4th Cir.1968), *cert. denied,* 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217 (1969). See generally: Annot., Expulsion, Dismissal, Suspension, Or Other Discipline Of Student Of Public School, College, Or University As Violating Due Process Clause Of Federal Constitution's Fourteenth Amendment—Supreme Court Cases, 88 L.Ed.2d 1015 (1985); Buss, Procedural Due Process For School Discipline: Probing The Constitutional Outline, 119 U.Pa.L.Rev. 545 (1971). Even in cases of tax supported schools, it is not required that the students be represented by counsel. See: *Gorman v. University of Rhode Island, supra; Wasson v. Trowbridge, supra.* But see: *French v. Bashful,* 303 F.Supp. 1333 (E.D.La.1969).

The law pertaining to judicial review of disciplinary proceedings at private colleges and universities is not so well settled. Generally, it has been said that courts are more reluctant to interfere in the disciplinary proceedings of a private college than those of a public college. See: 14 C.J.S. Colleges and Universities § 26, at 1361 (1939); 15A Am.Jur.2d Colleges and Universities § 23, at 281 (1976).

See also: *Grafton v. Brooklyn Law School,* 478 F.2d 1137 (2d Cir.1973); *Powe v. Miles,* 407 F.2d 73 (2d Cir.1968). A majority of the courts have characterized the relationship between a private college and its students as contractual in nature. Therefore, students who are being disciplined are entitled only to those procedural safeguards which the school specifically provides. See: *Corso v. Creighton University,* 731 F.2d 529 (8th Cir.1984); *Williams v. Howard University,* 528 F.2d 658 (D.C.Cir.1976), *cert. denied,* 429 U.S. 850, 97 S.Ct. 138, 50 L.Ed.2d 123 (1976). See also: *John B. Stetson University v. Hunt,* 88 Fla. 510, 102 So. 637 (1924). The general rule, therefore, has been that where a private university or college establishes procedures for the suspension or expulsion of its students, substantial compliance with those established procedures must be had before a student can be suspended or expelled. *Tedeschi v. Wagner College,* 49 N.Y.2d 652, 427 N.Y.S.2d 760, 404 N.E.2d 1302 (1980). See: *Corso v. Creighton University, supra* (preliminary injunction properly granted to prevent private university from dismissing student for cheating, where student was not provided with contractual right to hearing as provided in student handbook). Compare: *DeHaan v. Brandeis University,* 150 F.Supp. 626 (D.Mass. 1957).

In recent years the courts have become more willing to grant judicial review of rules promulgated by private colleges and universities and have required that such rules comport with basic notions of due process and fundamental fairness. See: Silets, Of Student's Rights And Honor: The Application Of The Fourteenth Amendment's Due Process Strictures To Honor Code Proceedings At Private Colleges And Universities, 64 Den.U.L.Rev. 47 (1987); Thigpen, The Application Of Fourteenth Amendment Norms To Private Colleges And Universities, 11 J.Law & Educ. 171 (1982). Cf. Note, Common Law Rights For Private University Students: Beyond The State Action Principle, 84 Yale L.J. 120 (1974). Thus, in *Clayton v. Trustees of Princeton University,* 608 F.Supp. 413 (D.N.J.1985), a student who had been

suspended for one year, after a finding that he had cheated in an examination, brought suit in federal court to challenge Princeton University's Honor Code. Although rejecting the student's challenge to the Code, the court held that a student at a private university subjected to a disciplinary hearing for cheating has a judicially protectable interest in ensuring that the proceedings against him are fundamentally fair. There, the Court found that Princeton had followed its own Honor Code and the proceedings had been carried out diligently and fairly. See also: *Henson v. Honor Committee, University of Virginia*, 719 F.2d 69 (4th Cir. 1983). Other courts have followed this approach and have held generally that disciplinary acts by private colleges or universities will be upheld so long as the proceedings have been fundamentally fair and the school has not deviated substantially from the procedures established by the school. See and compare: *State v. Schmid*, 84 N.J. 535, 423 A.2d 615 (1980), *appeal dismissed*, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982); *Napolitano v. Princeton University Trustees*, 186 N.J.Super. 548, 453 A.2d 263 (1982). Cf. *Rutledge v. Gulian*, 93 N.J. 113, 459 A.2d 680 (1983) (judicial intrusion into suspension of member of Free and Accepted Masons should be confined to procedures which are fundamentally unfair).

In *Slaughter v. Brigham Young University*, 514 F.2d 622 (10th Cir.1975), *cert. denied*, 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed.2d 131 (1975), a graduate student at a private, church affiliated university had brought an action alleging breach of contract following his expulsion for academic dishonesty. In reversing a jury verdict in the student's favor, the United States Court of Appeals for the Tenth Circuit applied a due process analysis to review the university's disciplinary proceedings. The Court reasoned:

It must be held that there was an adequate hearing on the charge with a meaningful opportunity given to plaintiff to participate, to present his position, and to hear the witnesses presenting the facts they had knowledge of. We hold that these proceedings met the requirements of

the constitutional procedural due process doctrine as it is presently applied to public universities. It is not necessary under these circumstances to draw any distinction, if there be any, between the requirements in this regard for private and for public institutions. The trial court was thus in error in deciding as a matter of law that the proceedings were deficient or inadequate. His instruction to the jury as to his erroneous conclusion was error.

When the courts lay down requirements for procedural due process in these situations as required by the Constitution, and when the school administrators follow such requirements (and other basic conditions are met), some weight must then be given to their determination of the facts when there is substantial evidence to support it. Thus if the regulations concerned are reasonable; if they are known to the student or should have been; if the proceedings are before the appropriate persons with authority to act, to find facts, or to make recommendations; and if procedural due process was accorded the student, then the findings when supported by substantial evidence must be accorded some presumption of correctness. The adequacy of the procedure plus the substantial evidence element constitute the basis and the record to test whether the action was arbitrary. The fact-finding procedures were adequate.

*Id.* at 625. The Court rejected a strict contractual approach, reasoning

The complaint was based on a contract theory and that alone, but neither the conclusory allegations of the complaint showed, nor did the proof submitted by the plaintiff establish, a contract between plaintiff and the University in the disciplinary context. The Graduate School Catalogue and the conduct-honor codes were the only evidence as to the "contract." The trial court's rigid application of commercial contract doctrine advanced by plaintiff was in error, and the submission on that theory alone was error.

It is apparent that some elements of the law of contracts are used and should be used in the analysis of the relationship between plaintiff and the University to provide some framework into which to put the problem of expulsion for disciplinary reasons. This does not mean that "contract law" must be rigidly applied in all its aspects, nor is it so applied even when the contract analogy is extensively adopted.

*Id.* at 626.

In Pennsylvania, the Supreme Court has not had recent opportunity to address this area of the law. However, in *Barker v. Trustees of Bryn Mawr College,* 278 Pa. 121, 121 A. 220 (1923), the Court held that a court of common pleas lacked jurisdiction to issue a writ of mandamus to compel the reinstatement of a student dismissed from a private college because the relationship between the college and student was solely contractual in nature. The Court reasoned as follows:

We agree with the court below that, on the facts showing the character of Bryn Mawr College, as an institution privately conducted, which receives no state aid, "the relation between the student and the college is solely contractual in character, [and] the court of common pleas does not have jurisdiction to issue a writ of mandamus to compel [appellant's] reinstatement"; also, in view of the regulation, on which the relator obtained entrance to the college, providing that the latter "reserves the right to exclude at any time students whose conduct * * * it regards as undesirable," defendant is not required to prefer charges and hold a trial thereof, before dismissing a student regarded by it as undesirable.

*Id.,* 278 Pa. at 122–123, 122 A. at 221. See and compare: *Strank v. Mercy Hospital of Johnstown,* 383 Pa. 54, 117 A.2d 697 (1955) (where student nurse was expelled from private nursing school for infraction of rules and sought in equity action to have school give her transfer credits for work completed, action was within peculiar province of equity since there was no legal remedy).

More recently, the Superior Court followed generally the decision in *Barker,* but acknowledged the existence of modern decisions requiring private schools to adhere to principles of due process and fundamental fairness. In *Schulman v. Franklin and Marshall College,* 371 Pa.Super. 345, 538 A.2d 49 (1988), a student had been suspended after being found guilty of misconduct directed to female students. The trial court refused to grant a preliminary injunction enjoining the suspension, and the student appealed. In affirming, the Superior Court observed:

> The courts have been very reluctant to interfere with college proceedings concerning internal discipline. *A college is a unique institution which, to the degree possible, must be self-governing and the courts should not become involved in that process unless the process has been found to be biased, prejudicial or lacking in due process.* While many people would apply different standards than those applied by a given college, we must understand that colleges, by their composition, particularly private colleges, will reflect different standards and different attitudes and values concerning student misbehavior. A college is frequently selected by parents and students because of the special aura or quality of life on campus that distinguishes it from other institutions. Frequently, colleges are classified in the public mind and the media as liberal or conservative, religious or secular, party schools or intellectual bastions. From the days of the Medici's, who created the colleges in Florence during the Renaissance, to modern times, colleges have been unique in their insulation from state taxation controls and their self-government.

*Id.,* 371 Pa.Superior Ct. at 351, 538 A.2d at 52 (emphasis added). But see: *Smith v. Gettysburg College,* 22 Pa.D. & C.3d 607 (Adams Co.1982) (Fourteenth Amendment due process not applicable to private schools, relationship between college and students purely contractual in nature).

Our review of the record in the instant case discloses that the School of Veterinary Medicine followed its Code of

Rights punctiliously and that the disciplinary proceedings complied with due process and were fundamentally fair. The accused students were given notice of the charges against them and also of the evidence against them. They were present at and participated in a hearing which lasted approximately ten and one-half hours. At this hearing they were assisted by a faculty advisor and were permitted to cross-examine witnesses who testified against them and call witnesses to testify on their behalf. After the hearing, the hearing panel prepared a detailed decision, including findings of fact, as follows:

Decision of the Hearing Panel:

After careful consideration of the charges and evidence presented at the June 28, 1989 hearing of Maria Stanik and Cheryl Boehm, veterinary students in the class of 1992 accused of violating the code of academic integrity, we, the hearing panel by unanimous agreement find the defendants guilty of behavior suspicious of, and compatible with cheating.

Findings of fact:

The panel members expressed a range of opinion as to what constitutes cheating in a test situation; from the strict definition that even a brief but focused glance at a fellow student's exam paper is, of itself, a clear act of cheating to the liberal interpretation, maintaining that overt cheating can only be established if the accused can be shown to have benefitted from the practice or was caught with tangible evidence such as crib sheets or consistently identical answer sheets. Because of the gravity of the charge of cheating, the panel members in their deliberations leaned toward the latter, more liberal definition of cheating. The Panel's verdict (and recommended penalty) reflect this stance and admittedly give the accused the benefit of the doubt.

In addition, the verdict, was rendered, as such, because the evidence presented, though compelling, was at times circumstantial or in need of qualification. The verdict does not exclude the possibility that the two defendants

were innocent of the cheating charges. It does however firmly establish that in multiple examinations the behavior of these two individuals was determined to be inappropriate and academically unacceptable.

We submit the following findings of fact:

1. A comparison of test scores of the two students accused of cheating was introduced as evidence at the June 28, 1989 hearing. While the information raises suspicion as to the cheating charges, the panel considers the comparison to be unreliable due to its lack of statistical foundation particularly since the influence on test scores of studying together is unknown. Accordingly this information was not considered in the panel's deliberations.

2. The panel finds the testimony of Richard Aucamp, a technician having 20 years of experience in proctoring anatomy examinations, to establish on three occasions in the 2nd practical of the anatomy course that the two defendents [sic] were observed to be engaged in behavior indistinguishable from cheating. Mr. Aucamp was certain that he saw Maria Stanik looking at Cheryl's paper during the exam. The behavior of Maria and Cheryl provoked a warning from Mr. Aucamp to cover their papers and to separate. The behavior persisted and ultimately Mr. Aucamp issued a threat to take their test papers.

3. We find the testimony of Dr. Adrian Morrison concerning the 2nd practical examination of the anatomy course to corroborate that of Mr. Aucamp. Dr. Morrison after being summoned to the lab of Mr. Aucamp to address the persistent suspicious behavior of the two defendants, observed "Maria Stanik's eyes going to Cheryl Boehm's paper, back and forth." Dr. Morrison asked the two students to separate and they complied by parting for the remainder of the practical examination and the subsequent written part of the examination. The panel recognizes the human tendency to be tolerant and to avoid confrontation, however, a minority opinion held that

this serious indictment was weakened by the delay in briniging [sic] it to the attention of the judicial administrator.

It is worthy of mention that, by design, students were to take the anatomy practical exam in alphabetical order and therefore Cheryl Boehm and Maria Stanik should not have been in the same test group. Cheryl claimed she switched from her designated group into Maria's group so she could drive her car to the garage to be serviced, however it is the panel's understanding that she did not obtain prior permission to take the test out of alphabetical order.

4. We find the sincerity and timing of Sheppard Thorp's accusations to be compelling evidence that the two defendents [sic] had engaged in behavior indistinguishable from cheating during the Immunology quiz given January 31, 1989. This information was embodied in 2 letters from Mr. Thorp, one anonymous and one signed (dated Jan. 31, 1989 and March 28, 1989, respectively).

5. We find the letter and testimony of classmate, Eugenia Bucher, to be sincere and to clearly substantiate that the two defendants during the Immunology final exam (3/3/89) were engaged in behavior suspicious of, and compatible with cheating. The defendants were sitting inappropriately close together and talking repeatedly during the exam.

6. We find the letter of Lisa Schorr (3/22/89) to be an unequivaocal [sic] first-hand account of cheating on the part of the two defendants. However, because Ms. Schorr was not available for testimony, the panel did not include this most incriminating evidence in its decision. We feel, however, that the veracity of Lisa Schorr's letter and testimony is critical to a determination of overt cheating in this case. Therefore, we feel it appropriate to request waiver of Article VIII Paragraph 2 entitled "Scope of Appeals" thereby allowing for an *increase* in the severity of the penalty imposed should an appeal

occur and should the appeals panel substantiate Lisa Schorr's testimony as fact.

7. At the hearing the panel was presented with evidence other than that summarized above. This evidence was in the form of letters (followed in some cases by testimony) from 7 classmates claiming eyewitness accounts of supicious [sic] behavior, if not overt cheating, on the part of the two defendants. The panel, for the following reasons, did not include this material in arriving at its verdict.

1) All 7 letters were submitted toward the end of March, 1989 at the request of the class president, Howard Krumm, acting on the recommendation of the Associate Dean for Student Affairs, Dr. Charles Newton. Six of the 7 letters alleged cheating by the two defendants during the Immunology Final Exam on March 3, 1989. The individuals involved on both sides of the argument were by this time polarized sufficiently that the panel questioned the objectivity of their motivation and testimony. On the one hand, were the accusing students who felt frustrated that the system could not deal more rapidly and decisively with what they perceived to be overt and chronic cheating on the part of the 2 defendants. On the other hand, Maria Stanik and Cheryl Boehm contend they were the innocent victims of a hate campaign focused on them because of their peculiar behavior and class isolation.

2) Some of the evidence was highly circumstantial in nature and a few discrepancies were identified between the letters of complaint and the ultimate testimony before the hearing panel.

3) The panel concluded that its verdict was neither strengthened nor weakened by the inclusion of this evidence and that the surrounding aura of emotions served only to complicate the task of determining guilt or innocence from the preponderance of evidence.

■ A review of the panel's decision compels the conclusion that the hearing was held before an impartial panel and

that the students were given a fair hearing. The disciplinary proceedings complied fully with procedures established by the school and were fundamentally fair.

■ The students complain, however, that they were found guilty of conduct which is not prohibited by the Honor Code. The Code, in pertinent part, provides:

### III. *VIOLATIONS OF ACADEMIC INTEGRITY*

Conduct incompatible with these principles of academic integrity shall be a violation of this Code. Violations include, but are not limited to, the following:

. . . .

3. *Misconduct during an Examination.* Copying from another student's paper, consulting unauthorized material, giving information to another student, or colluding with one or more students during an examination.

The offenses enumerated in subsection (3) are not an exclusive listing of the forms of misconduct prohibited during an examination. The Code proscribes any conduct which is incompatible with principles of academic integrity enumerated in the Code. Thus, the hearing panel could properly find, as it did, that the students were guilty of behavior which was compatible with cheating. Their talking with each other during examinations and their looking at each other's papers were supportive of the hearing panel's conclusion that their conduct was compatible with cheating and incompatible with principles of academic integrity.

Based on these findings, the hearing panel recommended to the Dean that punishment be imposed as follows:

1. The 2 students, Maria Stanik and Cheryl Boehm, shall be on probation for the remainder of their Veterinary curriculum here at Penn.

2. These students will be required to sit apart during all examinations or quizzes for the remainder of their Veterinary curriculum here at Penn.

3. The appropriate section heads and course organizers of the courses involved should be notified of the "behav-

ior" of these two students and have the exam closely proctored.

4. A note should be placed on the respective transcripts stating that the students in question were "found guilty of behavior suspicious of, and compatible with cheating". This note may be removed at the petition of the students during the senior year assuming no further infraction of the code of academic integrity occurs.

■ The students were given a copy of the panel's findings of fact, but they were not given a copy of the recommended penalty. They argue that this violated the provisions of the code. We disagree.

The Code provides:

VI. *HEARING PANEL PROCEDURES*

. . . .

3. *Decisions of the Hearing Panel*

(a) The Hearing Panel's deliberations shall be divided into two separate stages:

(i) determination of guilt or innocence

(ii) recommendation of penalty

(b) A finding of guilt must be supported by a preponderance of the evidence.

(c) The JIO shall neither report on the accused's previous disciplinary record, nor recommend a penalty, until guilt has been determined.

(d) All decisions shall require a majority vote of those sitting.

(e) *The presiding officer shall present a written report of the Hearing Panel's decision, including a statement of the Panel's findings of fact, to the accused,* the JA, the JIO and the Dean no later than ten days after the hearing. (emphasis added).

The established procedure contains no requirement that the students be given a copy of the panel's recommended punishment. The reason for the absence of such a requirement is clear. The punishment is to be determined by the Dean.

When the Dean's decision regarding punishment was made in this case, the students were duly notified. There was in the disciplinary proceedings no substantial departure from the procedure established by the school.

■ The students complain that the Dean did not accept the panel's recommendation and imposed a more severe punishment. This does not establish a basis for relief in the courts. The punishment was to be determined by the Dean; he was not bound to accept the recommendation of the panel. In this regard, it is also to be observed that the students took an appeal, as permitted by the Code, to an appeals committee. This committee rejected their argument that the penalty was too severe.

■ The students also complain that the Dean may have discussed the case with others and may have asked their opinions regarding punishment before reaching a decision. The trial court does not appear to have been persuaded by this argument, for it made no findings in this regard and did not suggest, expressly or by implication, that there had been any impropriety in the formulation of a sanction by the Dean. In the absence of such findings, we will not assume the role of factfinder and find the Dean guilty of conduct inconsistent with basic fairness. His role was not one surrounded by strict judicial trappings. He was an administrator and academician, charged with punishing violations of the School's Honor Code which had been found after hearing. He will not be faulted if, in the pursuit of his duties, he discussed the matter of punishment with his colleagues or even sought their advice. The record does not suggest and the students have not contended that he abdicated to others his responsibility for determining and imposing an appropriate punishment.

■ Finally, the students argue that in spite of the limited findings of the panel that they were guilty of conduct compatible with cheating, the Dean punished them as if they had cheated in fact. Here again, the trial court made no such findings, and the record does not permit our

finding the facts to be as contended by the student-appellees. The Dean testified that he believed that the students had cheated, but he acknowledged that he was bound by the findings of the hearing panel and could not disregard those findings in determining the sanction to be imposed. Under these circumstances, it cannot be determined factually by an appellate court that the students were punished for offenses for which they had not been found guilty by the hearing panel.

The trial court suggested, without discussion, that there was evidence that the students had not received "adequate" notice and a "meaningful" opportunity to be heard. It was for this reason that a temporary injunction was issued. This suggestion, however, is not supported by the record before this Court, and, indeed, such an argument has not been pursued by the students on appeal. They had notice and an opportunity to be heard.

■ Appellees' principal contention in the trial court was that they would be irreparably harmed if the trial court failed to grant preliminary relief. The harm which would warrant a preliminary injunction, however, must be viewed conjunctively with the existence or absence of a clear right to relief. Here, as we have observed, the students have been unable to show circumstances requiring judicial intervention in the disciplinary proceedings conducted by the School of Veterinary Medicine.

■ In general, an injury is regarded as irreparable if it will cause damages which can be estimated only by conjecture and not by any accurate pecuniary standard. See: 5 Std.Pa.Prac.2d § 83.81 (1983); 18 P.L.E. Injunction § 5 (1989). "An injury is deemed irreparable if it cannot be adequately compensated by an award of damages. *Cosner v. United Penn Bank*, 358 Pa.Super. 484, 492, 517 A.2d 1337, 1341 (1986). For harm to be irreparable, moreover, it must be irreversible. *Schulman v. Franklin & Marshall College, supra* at 350, 538 A.2d at 52.

■ In *Schulman v. Franklin & Marshall College, supra,* the Superior Court observed that the suspension

there imposed by the college would cause a delay in the student's education but it would not prevent him from completing the educational process. In view of the fact that it was not likely that the student would prevail on the merits, the Court concluded, there was no irreparable harm to be avoided by entering a preliminary injunction. If there should be damages, the Court concluded, they could be compensated adequately by monetary damages.

Similarly, in *Bleicker v. Board of Trustees of Ohio State,* 485 F.Supp. 1381 (S.D. Ohio 1980), a preliminary injunction was denied to a veterinary student who had been suspended for violating the school's honor code and for failing to meet academic standards. The court rejected the student's claim of irreparable harm, saying

> The Court believes that plaintiff has not made the required showing of irreparable injury if she is not readmitted to the Veterinary College for Spring Quarter of 1980. The record reveals that plaintiff will be allowed to petition for readmission to the Veterinary College within a few months without the intervention of this Court. The Court's immediate order is not necessary to prevent permanent exclusion of plaintiff from the veterinary profession.

*Id.* at 1388. See also: *Sohmer v. Kinnard,* 535 F.Supp. 50 (D.Md.1982) (suspension of pharmacy student for drug use did not cause irreparable harm to student because he could apply for readmission when he could show that he no longer had a drug problem. Delay in entering his chosen profession if wrongful, the Court said, was compensable by money damages). Compare: *Dougherty v. Hidalgo,* 539 F.Supp. 4 (E.D.Pa.1981), *aff'd on other grounds,* 688 F.2d 158 (3d Cir.1982) (discharge of midshipman from Naval Academy for sexual misconduct not enjoined preliminarily because of greater, potential harm to Naval Academy).

We recognize that a contrary view has been articulated in *Jones v. Board of Governors of the University of North Carolina,* 557 F.Supp. 263 (W.D. N.C.1983), affirmed at 704 F.2d 713 (4th Cir.1983). There, the Court held that a

student could not be adequately compensated for delay in obtaining a degree caused by a suspension. Compare: *Tully v. Orr,* 608 F.Supp. 1222 (E.D. N.Y.1985) (disenrollment from Air Force Academy for cheating and plagiarism constituted irreparable harm, but injunctive relief denied because little likelihood of success on the merits was shown).

In the instant case, the trial court elected to disregard the decision in *Schulman* and follow the North Carolina court's decision in *Jones.* Although circumstances may vary from case to case, where, as here, it is unlikely that the students will be able to obtain a judicial reversal of their suspension, *Schulman* represents the better approach. The harm to the appellee students, if any, can be compensated by an award of monetary damages. The evidence did not justify the trial court's interference with the legitimate authority of the school to sanction students who, after compliance with established procedure, had been found guilty of violating the school's Honor Code by engaging in conduct incompatible with academic integrity.

Order reversed.