J-A28025-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| J.K., A MINOR, BY B.K., GUARDIAN, B.K., R.K. AND A.O., AND HIS PARENTS G.O. AND S.O., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| THE HILL SCHOOL AND ZACHARY G. LEHMAN, | |
| Appellees | No. 842 EDA 2016 |

Appeal from the Order Entered March 4, 2016
In the Court of Common Pleas of Montgomery County
Civil Division at No(s): 2016-03886

BEFORE:  PANELLA, SHOGAN, and PLATT,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED APRIL 20, 2017**

Appellants, J.K., a minor, by B.K. Guardian, B.K., R.K. and A.O., and his parents G.O. and S.O., appeal from the order that granted the request of Appellees, The Hill School and Zachary G. Lehman, to dissolve a special injunction.[1]  We affirm.

The trial court summarized the factual and procedural history of this case as follows:

### I.  FACTS

---

[*]  Retired Senior Judge assigned to the Superior Court.

[1]  An order dissolving an injunction is appealable pursuant to Pennsylvania Rule of Appellate Procedure 311(a)(4).

[J.K.] and [A.O.] ("Appellants," collectively, or "[J.]" or "[A.]," individually) were senior students at The Hill School ("Hill"), Appellee, a residential private educational institution in Pottstown, PA. On February 14, 2016, dorm parent Nathanial Yinger ("Yinger") found Appellants and another student, nonparty "G," in a closet in the basement of Wendell Dormitory. Yinger testified that he was taking his trash out when he noticed somebody entering the closet, an area off-limits to students. When he opened the door, he smelled marijuana and found Appellants and G inside, spraying air freshener. [A.] was in possession of a vaporizer, an apparatus commonly used to consume marijuana. The vaporizer was loaded with a "very small amount of marijuana." Appellants walked away from the scene while G remained with Yinger.

Appellants reported hearing that G invoked the "I Care" system on behalf of himself and Appellants. I Care is a system set forth in the Student Handbook, and is incorporated by reference in the Re-enrollment Contracts ("Contracts") signed by Appellants' parents. I Care is short for "Immediate Care" and allows students to "care for each other by seeking the assistance of an adult in dangerous situations without fear of dismissal or other disciplinary action." Under the I Care system, students may bring him/herself or another student under the influence of a substance to any adult in the school community without fearing a disciplinary response. I Care must be student initiated. A student's attempt to initiate the I Care system is invalid if "an adult has already observed, obtained evidence, or is investigating that a violation has occurred." Accordingly, the I Care system may only be invoked "before any adult discovers or is investigating that a violation has occurred." Outside of I Care, Headmaster Zachary Lehman, Appellee, testified that it is Hill's policy to immediately dismiss students found in violation of Hill's drug policies. As discussed *infra*, the evidence presented supports his testimony.

Based on G's representations, Appellants were under the impression that they were under the protection of I Care. As a result, they cooperated with Yinger and the other faculty, voluntarily handing over contraband from their rooms and consenting to a urine test. No faculty member ever expressly stated to the students that they were accepted into the I Care system. Appellants were instructed to compose written statements describing the event. Headmaster Lehman

instructed the deans to conduct a proper and thorough investigation of the incident. Thereafter, Headmaster Lehman informed Appellants that they were officially dismissed from the Hill School. [J.] admitted that he "attempted" to smoke marijuana, and that the closet smelled of marijuana when Yinger opened the door. [A.] and [J.] have both used marijuana in the dormitory on multiple occasions.

## II. PROCEDURAL HISTORY

On February 29, 2016, Appellants initiated the above-captioned matter by filing a Complaint styled as a "Complaint in Equity" despite the abolishment of a separate action in equity and recognition of the "consolidated civil action" providing the vehicle for appropriate relief, be it legal or equitable. On the same day, Appellants filed a Petition for Special and Preliminary Injunctive Relief pursuant to Pa.R.C.P. 1531(a). Both filings requested an injunction ordering Appellees to 1) immediately reinstate Appellants in the 12th grade at Hill, 2) to refrain from notifying any prep school or college to which Appellants may apply or have appl[ied] of the dismissals, 3) to provide the teacher recommendations [J.] needed to apply to post-graduate educational programs at other prep schools, and 4) to not interfere with Appellants' education or opportunities to further their educations.

In support of the request for special relief, Appellants asserted that they had been summarily dismissed from Hill after they had invoked the protection of the I Care Program. Appellants impressed upon the Court the severe consequences of dismissing Appellants just three (3) months before their graduation with possible ramifications on their pursuit of post-secondary education.

After reviewing all filings and appreciating the gravity and alleged arbitrariness of the situation as alleged in the petition for special relief, this Court issued an order providing temporary relief and, pursuant to Pa.R.C.P. 1531(d) scheduled a hearing for March 2, 2016 to determine whether the Court should continue to exercise jurisdiction over the matter and consider whether the order granting temporary relief should remain in place in its original form.[1]

<sup>1</sup> The March 1, 2016 Scheduling Order (docketed on March 2, 2016) scheduling arguments makes reference to the Emergency Petition for Special and Preliminary Injunctive Relief filed by Plaintiffs on February 29, 2016. The record reflects that all parties understood the purpose of the hearing was to address Defendants' Emergency Motion to Reconsider and Dissolve Ex Parte Mandatory Injunction.

On March 1, 2016, Appellees filed an Emergency Motion to Reconsider and Dissolve Ex Parte Mandatory Injunction.

Trial Court Opinion, 5/5/16, at 2-4 (internal citations omitted). The trial court held hearings on March 2, 3, and 4, 2016. On March 4, 2016, the trial court entered an order dissolving the special injunction dated February 29, 2016. This timely appeal followed. Appellants and the trial court have complied with Pa.R.A.P. 1925.

Appellants present their issues for our review as follows:

Whether this Court should vacate the Trial Court's Order dissolving the Special Injunction . . . because Appellants demonstrated substantial legal questions and/or that they were likely to prevail on the merits of their breach of contract claim, where: (A) the Headmaster's unilateral dismissal of [J.] and [A.], based on suspected drug use that did not take place in a dormitory, violated the Campus Regulations and other portions of The Hill School Handbook; (B) the School failed to conduct a "proper investigation" to determine if [J.] and [A.] were guilty "beyond a reasonable doubt" prior to dismissal, in further violation of the Campus Regulations; and (C) [J.] and [A.] relied to their detriment on a request for Immediate Care (a "system" relating to controlled substance use promulgated by the School "to allow students to get help for themselves or other students without the threat of a disciplinary response") by fully cooperating with school personnel (providing inculpatory materials and statements as requested), only to find themselves expelled with eight weeks of classes remaining, and with a permanent record of dismissal that removed them from

consideration by most universities, and eliminated any possibility that [J.] could attend a post-graduate year at a different college preparatory school to further develop his skills in soccer before enrolling at a university.

Appellants' Brief at 5-6. Appellants argue that the trial court erred in dissolving the injunction that had been granted in their favor. Appellants' Brief at 34-37. Essentially, Appellants contend that the trial court improperly concluded that Appellants failed to demonstrate that they were likely to prevail on the merits of their breach of contract claim.

Pennsylvania Rule of Civil Procedure 1531 governs injunctions and provides that:

> (a) A court shall issue a preliminary or special injunction only after written notice and hearing unless it appears to the satisfaction of the court that immediate and irreparable injury will be sustained before notice can be given or a hearing held, in which case the court may issue a preliminary or special injunction without a hearing or without notice. In determining whether a preliminary or special injunction should be granted and whether notice or a hearing should be required, the court may act on the basis of the averments of the pleadings or petition and may consider affidavits of parties or third persons or any other proof which the court may require.

Pa.R.C.P. 1531(a).

The rule further requires the following in the event that the court grants an *ex parte* injunction:

> (d) An injunction granted without notice to the defendant shall be deemed dissolved unless a hearing on the continuance of the injunction is held within five days after the granting of the injunction or within such other time as the parties may agree or as the court upon cause shown shall direct.

Pa.R.C.P. 1531(d). Then, "[a]fter a preliminary hearing, the court shall make an order dissolving, continuing or modifying the injunction." Pa.R.C.P. 1531(e).

We have stated that "[a] preliminary injunction's purpose is to preserve the *status quo* and to prevent imminent and irreparable harm that might occur before the merits of a case can be heard and determined." ***Ambrogi v. Reber***, 932 A.2d 969, 976 (Pa. Super. 2007). A petitioner seeking a preliminary injunction must establish every one of the following prerequisites; if the petitioner fails to establish any one of them, there is no need to address the others. ***Kessler v. Broder***, 851 A.2d 944, 947 (Pa. Super. 2004) (citing ***Summit Towne Centre, Inc. v. Shoe Show of Rocky Mt., Inc.***, 828 A.2d 995 (Pa. 2003)).

> First, a party seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. Second, the party must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. Fourth, **the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits**. Fifth, the party must show that the injunction it seeks is reasonably suited to abate the offending activity. Sixth and finally, the party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest.

*Id*. (emphasis added). In addition, we have held "that the relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract." *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. 1999).

Further, we are mindful that "an appellate court reviews an order granting or denying a preliminary injunction for an abuse of discretion." *SEIU Healthcare Pennsylvania v. Commonwealth*, 104 A.3d 495, 501 (Pa. 2014). We do not examine the merits of the lawsuit and instead, must determine if "there were any apparently reasonable grounds for the action of the court below." *Id*. (citation omitted). "[T]he scope of review in preliminary injunction matters is plenary." *Warehime v. Warehime*, 860 A.2d 41, 46 n.7 (Pa. 2004).

Initially, Appellants assert that their dismissal by the headmaster was improper because the violation of school rules did not occur in a dormitory. Appellants' Brief at 37-42. Appellants claim that the area where they were discovered with the marijuana was merely an off-limits closet area in the basement of the building that did not meet the definition of a dormitory. As such, Appellants believe that a Discipline Committee should have handled the matter, not the headmaster.

Our review of the record reflects that the parents of Appellants entered into contracts on behalf of Appellants. The contracts state:

> I agree to the policy of the School which reserves the right to dismiss any student whose behavior or academic performance is decreed unsatisfactory. I acknowledge that my child/ward and I are aware that the School has issued certain rules and regulations, and that a student is subject to them as they may be revised from time to time.

Exhibits P-1 and P-3. Furthermore, the Hill Student Handbook, offers the following, in pertinent part, with regard to "Level 3 Offenses:"

> A student who fails to fulfill the basic responsibilities may lose the privilege of attending The Hill School, either temporarily in the case of suspension, or permanently in the case of required withdrawal. **The Headmaster, without convening the Discipline Committee, has the right to require the immediate withdrawal of any student at any time.**
>
> * * *
>
> Substance Use. Students are expected to remain drug and alcohol free at all times. The use of illegal drugs and/or alcohol and the misuse of over-the-counter or prescription drugs by students on or off campus harm both individuals and the community (refer to Medication Policy, p. 48). It violates federal, state, and local laws; it adversely affects the individual's physical, mental, and emotional development; and it lowers the expectations of other students by setting a poor example of what it is to be a student at The Hill. **The School is committed to preventing the use of drugs and alcohol by Hill students, especially in our dormitories. The School must ensure that our dormitories are safe havens for all residents. Every student in school must be assured that his or her residence will be a safe, wholesome place, free of alcohol and illegal drugs. Therefore, a student found in possession of alcohol or illegal drugs, or under their influence in the dormitory, will be required to withdraw from the School immediately.**

**The Discipline Committee will not review violations of our alcohol and drug rules in the dormitory. Instead, in such cases the student will be immediately dismissed, following a proper investigation (that determines his or her guilt beyond a reasonable doubt)**.

The Hill School Handbook at 41 (emphases added).

In addressing this contention by Appellants that their dismissal by the headmaster was improper because they were not in a dormitory, we observe that the trial court offered the following cogent analysis:

> These "rules and regulations" [in the contracts signed by Appellants' parents] refer to those set forth in the Student Handbook. The Student Handbook endows the headmaster with the authority to immediately dismiss students without convening the Discipline Committee. (Exhibit D-1 at 41). This power is described under the section entitled "Level 3 Offenses," which includes substance use rules. (*Id*.). The "Substance Use" subsection states, "Therefore, a student found in possession of alcohol or illegal drugs, or under their influence in the dormitory, will be required to withdraw from the school immediately." (*Id*.). If a student is caught with drugs in the dormitory, the student will be "immediately dismissed, following a proper investigation (that determines his or her guilt beyond a reasonable doubt)." (*Id*.). If a student is caught outside the dormitory, the Discipline Committee "will have discretion to respond appropriately to violations of these school rules." (*Id*.).
>
> Appellants contend that because they were caught with marijuana in the basement of a dormitory, they were technically not within a "dormitory" and therefore beyond the reach of this rule. (N.T. 3/3/16, 12:8-13-7). They argue that the basement was a common area accessible by female students, while the dormitories were gender-restricted. Therefore, the basement was separate and apart from the dormitory and not subject to the same rules. This argument is without merit. Regardless of whether the violation took place in the dormitory proper is irrelevant because the headmaster has plenary authority "to require the immediate withdrawal of any student at any time." (Exhibit D-1 at 41). If the headmaster decides to not dismiss, as is his right, then the Discipline Committee *may* take action in

cases of violations outside the dormitory. In addition, the Student Handbook sets forth steps that will be "automatically implemented" in "substance use cases *where the Headmaster decides that a student may remain part of the community*." (*Id*.) (emphasis added). The structure of Level 3 Offenses section of the Student Handbook clearly provides the headmaster the authority to expel in any substance use case. Therefore, the Court finds the classification of the basement to be irrelevant.

Trial Court Opinion 5/5/16, at 8-9.

We are constrained to agree with the trial court that whether the violation occurred in the basement of the building or in a sleeping room of the building is of no moment. As the Commonwealth Court, our sister appellate court, has aptly noted, "A University dormitory is not exclusively residential; it is an integral part of the overall educational experience." **Greaton Properties, Inc. v. Lower Merion Township**, 796 A.2d 1038, 1044 (Pa. Cmwlth. 2002).[2] We discern no error on the part of the trial court in concluding that the basement area of the building where Appellants were discovered qualifies as part of the dormitory and that the headmaster, not a discipline committee, had the right to make a decision regarding dismissal for violation of the drug policies set forth in the student handbook.

Appellants next contend that they were improperly dismissed because Appellees failed to conduct a proper investigation. Appellants' Brief at 42-

---

[2] "Although decisions of the Commonwealth Court are not binding on this Court, we may rely on them if we are persuaded by their reasoning." **NASDAQ OMX PHLX, Inc. v. PennMont Secs.**, 52 A.3d 296, 308 n.7 (Pa. Super. 2012).

45. Appellants note that dismissal would be preceded by a proper investigation and a determination of guilt beyond a reasonable doubt.

As the trial court observed:

> The spirit of the [Hill School's anti-drug] policy is clear: students found in possession of marijuana are liable for immediate expulsion. *See Boehm* [*v. University of Pennsylvania School of Veterinary Medicine*, 573 A.2d 575,] 579 [Pa. Super. 1990)] ("The general rule, therefore, has been that where a private university or college establishes procedures for the suspension or expulsion of its student, *substantial compliance* with those established procedures must be had before a student can be suspended or expelled.") (emphasis added).

Trial Court Opinion, 5/5/16, at 9.

Here, after hearing three days of testimony, the trial court concluded that Appellants failed to establish that the right to relief is clear and failed to show that they will likely prevail on the merits. Appellants entered into contracts with Appellees, and courts have characterized the relationship between a private school and its students as contractual in nature. *See Boehm*, 573 A.2d at 579 (observing that "[a] majority of the courts have characterized the relationship between a private college and its students as contractual in nature.") "Therefore, students who are being disciplined are entitled only to those procedural safeguards which the school specifically provides." *Id*.

Again, our review of the record reflects that the Student Handbook offers the following, in pertinent part, with regard to "Level 3 Offenses":

A student who fails to fulfill the basic responsibilities may lose the privilege of attending The Hill School, either temporarily in the case of suspension, or permanently in the case of required withdrawal. **The Headmaster, without convening the Discipline Committee, has the right to require the immediate withdrawal of any student at any time.** Students who are required to withdraw from the School, or withdraw in the face of disciplinary action, may not return to campus until a year after their form is graduated.

The following are major School rules; infractions of either the letter or the spirit of these rules are serious disciplinary matters and often lead to suspension or dismissal. Students knowingly in the presence of these rule violations add support by their presence and may also be held accountable.

Substance Use. Students are expected to remain drug and alcohol free at all times. The use of illegal drugs and/or alcohol and the misuse of over-the-counter or prescription drugs by students on or off campus harm both individuals and the community (refer to Medication Policy, p. 48). It violates federal, state, and local laws; it adversely affects the individual's physical, mental, and emotional development; and it lowers the expectations of other students by setting a poor example of what it is to be a student at The Hill. **The School is committed to preventing the use of drugs and alcohol by Hill students, especially in our dormitories.** The School must ensure that our dormitories are safe havens for all residents. Every student in school must be assured that his or her residence will be a safe, wholesome place, free of alcohol and illegal drugs. **Therefore, a student found in possession of alcohol or illegal drugs, or under their influence in the dormitory, will be required to withdraw from the School immediately.**

**The Discipline Committee will not review violations of our alcohol and drug rules in the dormitory. Instead, in such cases the student will be immediately dismissed, following a proper investigation (that determines his or her guilt beyond a reasonable doubt)**.

The Hill School Handbook at 41 (emphases added). The above language explains that the headmaster may immediately dismiss a student for

possession or use of illegal drugs following a proper investigation that determines guilt beyond a reasonable doubt.

The record further reflects that Zachary Lehman, the headmaster at The Hill School, offered the following testimony regarding the investigation leading up to his ultimate decision to dismiss Appellants:

> I looked at the statements of all three boys. I looked at all the contraband that had been produced. I talked to both deans, asked them to relay the entire incident up to that point. And I talked to the nurse to make sure that she was conducting the drug test.

N.T., 3/4/16, at 41. In addition, Mr. Lehman testified as follows concerning the timing of his decision to dismiss Appellants:

> Q. When did you make the decision that they be terminated or dismissed?
>
> A. I made that decision after I spoke with the boys one by one.
>
> Q. So not before?
>
> A. Not before.
>
> Q. You're certain.
>
> A. I was coming to a conclusion, but I always talk to the boys before I let them know that they're going to be dismissed. **The dismissal is my decision**.

*Id*. at 41-42 (emphasis added). Mr. Lehman further reiterated:

> Q. Your testimony is, before they were spoken with the decision had not been made to dismiss them as students; is that right?
>
> A. The only person that can dismiss students in a[n] immediate dismissal is me.
>
> Q. That is not my question.

- 13 -

A. I don't know what other people said to them. I wasn't in the room. I didn't ask [Dean] Allain. I didn't ask [Dean] Eccleston whether they had told them about dismissal.

Q. Had you told [Dean] Allain or anyone else that they were going to be dismissed?

A. I said in all likelihood they would be dismissed because this is an immediate dismissal situation because it was in the dormitory. **It was very clear, beyond a reasonable doubt, and a proper investigation had been conducted.**

Q. And this was before you spoke with the boys, correct?

A. Correct.

Q. So the decision really had been made before you spoke with them?

A. No. No.

*Id*. at 43-44 (emphasis added). Mr. Lehman offered the following explanation for his decision to dismiss Appellants:

I look at the total of the evidence. But the primary reason that I terminated them was that they were in possession of, using and admitted to using marijuana in the dormitory. That's an immediate dismissal.

*Id*. at 59.

Mr. Lehman also offered the following testimony regarding his discussion with Appellants:

Q. Did you hear them admit to using marijuana in the dormitory room?

A. Yes.

Q. You heard them say that?

A. Yes.

- 14 -

Q.  Did you hear them say that they used it in the dorm that day?

A.  Yes.

Q.  Did you make notes about that?

A.  I put it in my report to my attorneys that I mentioned previously.

Q.  And did you ask him or did they make those statements after you made the decision to terminate them?

A.  No.

Q.  So their admissions according to you was that they were smoking that day on the premises.  They confessed to you and you decided to terminate them, is that how it went?

A.  No.

Q.  Tell me how it went then?

A.  I asked my deans to conduct a proper and thorough investigation.  I reviewed all the evidence with the deans, including their statements, the contraband and their report -- their verbal report on the incident that happened.  I was contemplating all of this.  It's [a] difficult matter to dismiss students immediately.  It's a very serious matter.  I've done it numerous times.

* * *

I make the decision.  I try not to make the decision.  I do not like dismissing students.  It's my least favorite part of the job.

I went in the room and asked them had they been smoking marijuana and using marijuana in the dorm.

Q.  That day?

A.  That day.

Q. Or any other day?

A. That day.

Q. That day. Okay.

A. I continued to ask them had they smoked marijuana in the past. They admitted to doing that as well, all three of them, multiple times.

Q. They told you multiple times. That is what they said?

A. Yeah.

*Id*. at 59-61.

This testimony reveals that the decision to dismiss Appellants was made by Mr. Lehman, as headmaster of the school, in accord and in compliance with the provisions of the Student Handbook. As his testimony establishes, it was Mr. Lehman who made the decision to dismiss the students following a proper investigation that determined Appellants' guilt, *i.e.*, violating the possession and drug use policies of the institution, beyond a reasonable doubt. This was not a departure from the established procedure of the institution. In light of this testimony, we are constrained to agree with the trial court that Appellants, as the party seeking an injunction, did not show that the activity to be restrained is actionable, that the right to relief is clear, and that the wrong is manifest, or in other words, shows a likelihood of prevailing on the merits. Thus, we discern no error on the part of the trial court.

Appellants' final claim is that they cooperated with the investigation only because they believed that they were immune from dismissal due to the third student's attempted invocation of the provisions of I Care. Appellants' Brief at 46-50. Appellants allege that, under a theory of promissory estoppel, they cooperated with the investigation on the belief that they were protected from dismissal by I Care. We conclude that such assertion fails.

The doctrine of promissory estoppel is the law in Pennsylvania. **Thatcher's Drug Store v. Consolidated Supermarkets**, 636 A.2d 156, 160 (Pa. 1994). A party asserting a claim of estoppel has the burden of establishing all the essential elements. **Id**.

> One of those elements is that enforcement of the promise must be necessary to avoid injustice. Significantly,
>
> > satisfaction of [this] requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, **on the formality with which the promise is made**, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant.
>
> Restatement (Second) Contracts § 90, comment b.

**Id**. (emphasis added).

Concerning the I Care system, The Hill School Handbook provides the following:

**Getting Help for Yourself or Another (I Care)**

While we believe our policies around drugs and alcohol work to deter student use and help the School maintain a safer community, we do know that a percentage of students will continue to experiment with substance use. Students who do this endanger their lives and their Hill School careers. With the ultimate priority of students' physical well-being in mind we have created the I Care (Immediate Care) system that will allow students to get help for themselves or other students without the threat of a disciplinary response. I Care allows students to care for each other by seeking the assistance of an adult in dangerous situations without fear of dismissal or other disciplinary action.

**Basic Principles of I Care**

1. A student may bring him/herself or another student under the influence of a substance, or information concerning risky behavior related to substance use, to <u>any</u> adult in the community without fear of a disciplinary response.

2. Must be student initiated.

   a. **Not valid if an adult has already observed, obtained evidence, or is investigating that a violation has occurred. In other words, students are bringing information to adults that they do not already have or would not otherwise become available to adults.**

   b. **Faculty who observe or discover a violation are expected to follow established disciplinary procedures.**

3. Students who take advantage of this system will be put on a no-use contract, randomly drug tested, and assessed and counseled as recommended by the Counseling Office.

4. When a faculty member is following up on an I Care report, the student in question must cooperate fully and be honest about their situation. If a student denies being under the influence or refuses to cooperate with the faculty member, they will be subject to discipline.

5.  A student who violates his or her no-use contract by either a positive drug test or another use of the I Care system will be dismissed.

**Specifics**

• Students may call or go to any adult (Security, dorm parent or other faculty member, Health Center) on campus with information about another student under the influence.  A friend who cares will ideally escort his or her friend to an adult, but may need to care enough to simply let an adult know about another student's current dangerous situation.

• **The above must be done before any adult discovers or is investigating that a violation has occurred.**

• We encourage students to care so much about their friend's health and Hill career that they act immediately when they know of or see another student under the influence.

• Once a student takes advantage of the I Care system, he or she will be taken to the Health Center for proper medical care.

The Hill School Handbook at 42 (underlying in original, bold emphases added).

Our review of the record reflects that Nathaniel Tuck Yinger, an employee at The Hill School, testified before the trial court.  N.T., 3/4/16, at 9-38.  Mr. Yinger explained his involvement in the situation with Appellants and non-party "G" as follows:

I was taking my trash out.  I was going through the basement of Wendell.  And I noticed somebody going into a closet that students should not have access to. So I went to investigate the matter.  I opened the closet door and found a third party known as G spraying air freshener.  And I detected the scent of marijuana.

*Id*. at 12.  Mr. Yinger further testified:

I asked them what was going on. They tried to walk away. I stood there and insisted that they remain. And only G remained to be questioned.

*Id*. at 13. In addition, Mr. Yinger offered the following testimony:

Q. Now, Mr. G, I think we'll call him, he, when you opened the door, said I would like to put us all three in I Care, correct?

A. No, not at that moment.

Q. When did he say that?

A. After he had already been questioned and confirmed my suspicion.

Q. And when did that supposedly happen?

A. So after I insisted that they remain and only [G] stayed, **I questioned him**. I told him my suspicion. [G] confirmed my suspicion and became very upset and distraught and demanded that they be put in I Care.

*Id*. at 15-16 (emphasis added). Upon questioning by the trial court, the following transpired:

THE COURT: You said that student G confirmed your suspicion.

[MR YINGER]: Yes.

\* \* \*

THE COURT: What was your suspicion?

THE WITNESS: My suspicion was that the boys had been smoking marijuana and G was spraying air freshener to cover the scent.

THE COURT: Okay.

*Id*. at 24-25.

Regarding actually placing the students on I Care, Mr. Yinger testified as follows:

Q. So after you -- did you tell any of the boys that -- did you make any reference to I Care when you spoke with any of those boys in terms of going into I Care?

A. **I said I would try. I did not promise them I Care.**

Q. You said you were going to try to put them in I Care; is that correct?

A. Yes.

Q. When did you put it that way, when you said you were going to try?

A. When G became very upset and distraught and demanded that I put them in I Care.

*Id*. at 19 (emphasis added).

This testimony reflects that the request for the protection of I Care was initiated **after** Mr. Yinger had observed and began investigating the use of illegal drugs by the students. Under the provisions of I Care in the Student Handbook, a student must initiate I Care "**before** any adult discovers or is investigating that a violation has occurred." The Hill Handbook at 42. (emphasis added). As the handbook explains, I Care is "[n]ot valid if an adult **has already observed**, obtained evidence, **or is investigating** that a violation has occurred." *Id*. (emphases added). Because Mr. Yinger testified that I Care was requested **after** he observed the suspicious behavior and began his questioning of G and his investigation, the protections of the I Care protocol were not available to Appellants.

Furthermore, Mr. Yinger testified that he did not promise I Care protection and that he said he would "try." Thus, there was no formality to any alleged promise to initiate I Care protections. In light of this testimony, we must conclude that Appellants' contrary claim fails.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/20/2017