**Terence KIMBERG, Appellant**

v.

**UNIVERSITY OF SCRANTON; Wyoming Valley Health Care System, Inc.; Caroline Raskiewicz, Individually and as Program Director for the University of Scranton.**

**No. 09–3314.**

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) Oct. 4, 2010.

Filed: Oct. 27, 2010.

474

Todd M. Bales, Esq., Media, PA, Scott W. Morgan, Esq., Morgan & Morgan, Harrisburg, PA, Nathaniel Thompkins, Law Office of Todd Bales, Jenkintown, PA, for Appellant.

Devin J. Chwastyk, Esq., McNees, Wallace & Nurick, Harrisburg, PA, Elizabeth A. Maguschak, Esq., McNees, Wallace & Nurick, Hazleton, PA, Kimberly A. Boyer–Cohen, Esq., John J. Hare, Attorney, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, Robin B. Snyder, Esq., Marshall, Dennehey, Warner, Coleman & Goggin, Scranton, PA, for Appellee.

Before: SCIRICA, FUENTES and JORDAN, Circuit Judges.

OPINION OF THE COURT

SCIRICA, Circuit Judge.

Terence Kimberg was dismissed from the University of Scranton's Nurse Anesthesia Program in 2006. He sued the University of Scranton, the Wyoming Valley Health Care System and Caroline Raskiewicz, Program Director for, *inter alia,* breach of contract. After dismissing Kimberg's other causes of action, the District

Court granted Defendants summary judgment on his breach of contract claim. We will affirm.

## I.

In August 2004, Kimberg enrolled in the Nurse Anesthesia Program offered by the University in conjunction with Wyoming Valley. The Program consists of two essential components; enlisted students must both take courses within the University and complete clinical work at various local hospitals. As part of his clinical studies, Kimberg regularly administered anesthesia to patients under the supervision of a certified registered nurse anesthetist. ("CRNA"). For each day Kimberg was at the clinical site, the attending CRNA evaluated his performance.[1]

During a December 5, 2005 meeting in Raskiewicz's office, Kimberg received written notification that his performance had fallen short of Program standards. Specifically, Program administrators professed concerns regarding Kimberg's execution of a classroom presentation and his failure to complete certain competency evaluations.

The following month, Kimberg was placed on probation for clinical performance deficiencies. In rendering its disciplinary determination, the Program advised Kimberg that he "does not appear to have the total anesthetic picture," "consistently needs assistance," "needs a large amount of help," and "does not appear to be at the clinical level expected," and moreover that multiple CRNAs had balked at the hypothetical prospect of allowing Kimberg to administer anesthesia to their family members.

While on probation, Kimberg continued to receive negative evaluations from his supervising CRNAs. Several witnesses testified as to Kimberg's persistent travails. Patricia Harrington, chair of the University's Department of Nursing, testified that Kimberg was "insubordinate" during his probationary period and had dosed patients with medication he had been instructed not to provide. Jo Ann Platko, the Assistant Program Administrator, testified Kimberg's performance was imperiling patient safety. And Raskiewicz echoed this concern, indicating that a string of troubling incidents over the course of Kimberg's tenure within the Program had led her to determine that Kimberg posed a legitimate threat to the welfare of hospital patients.

Having failed to ameliorate the concerns of administrators during his stint on probation, Kimberg was notified on March 24, 2006 that he had been terminated from the clinical portion of the Program. The written notice of termination cited Kimberg's "failure to progress during [his] probationary period" as the official rationale for dismissal.

Immediately thereafter, Kimberg availed himself of the grievance mechanism provided within the Wyoming Valley Health Care System/University of Scranton School of Nurse Anesthesia School Handbook.[2] On March 27, Kimberg filed a

---

1. The Program's Clinical Grading Policy sets forth how students within the Program are evaluated. Students receive daily verbal feedback from their supervising faculty members as well as written daily clinical evaluations. At the close of each semester, students undergo "Triannual Evaluations" in which their clinical mentors determine whether the student has made the expected progress over the course of that marking period. Should a student fail to meet any objective, the clinical mentor decides whether to place the student on probation. Although Kimberg contends he initially received uniformly positive feedback, ultimately upwards of six CRNAs expressed reservations to Program administrators concerning Kimberg's clinical aptitude.

2. As explained below, the Handbook was part a collection of documents that structured the contractual relationship between the parties. *See infra* Part IV.B.

formal appeal of his termination and requested a hearing before the University's "Due Process Review Committee." On May 9, Raskiewicz notified Kimberg that he would not be permitted to have legal representation at his hearing. In lieu of pressing forward without the assistance of counsel, Kimberg elected to refrain from further pursuing his appeal. In May 2006, the University dismissed Kimberg from the Program after his unsatisfactory mark in the clinical portion appeared on his semester grade report.

## II.

Kimberg commenced this action on June 15, 2006 in the Middle District of Pennsylvania. His four-count complaint sought relief for (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) denial of due process; and (4) tortious interference with contract. Defendants moved to dismiss, and the District Court granted Defendants' motion as to three causes of action, leaving only the breach of contract claim.

Without first obtaining leave of court, Kimberg filed an Amended Complaint. Ostensibly recognizing the impermissibility of this action, Kimberg moved to dismiss voluntarily his Amended Complaint. The court granted this motion, striking the complaint from the record. On April 17, 2007, Kimberg properly filed a motion for leave to file an Amended Complaint. While that motion was pending, discovery on Kimberg's breach of contract claim proceeded apace. On several occasions, the parties moved by concurrence to extend the time to conduct discovery. Critically, it was during this time period that counsel elicited the deposition testimony regarding Kimberg's alleged noncompliance with Program protocol that would backstop Defendants' contention that Kimberg's dismissal conformed to applicable University procedures.

The District Court denied Kimberg's Motion for Leave to File Amended Complaint on November 19, 2007. With that motion resolved, the due date for Defendants' Answers to Kimberg's Complaint was fixed at December 3, 2007. Without having first filed their Answers within the allotted timeframe, Defendants moved for summary judgment on March 20, 2008. Apprehending their error only in the course of briefing their summary judgment motions, Defendants filed a Joint Motion for Extension of Time to File Answers *Nunc Pro Tunc* To Plaintiff's Complaint on April 30. Holding Defendants' failure to answer justified by "excusable neglect," the court granted Defendants' motion on November 5, and Defendants filed their Answers that day.

On January 29, 2009, 2009 WL 222658, the District Court granted summary judgment in favor of Defendants. In their Answers to Kimberg's Complaint, Defendants had posited a host of defenses collectively pointing toward the notion that Kimberg's sanctioning and dismissal were occasioned by a bona fide concern for patient safety and that, consequently, the disciplining fell within the proper scope of University procedures. In awarding Defendants summary judgment, the District Court accepted this argument and concluded Kimberg had failed to create a triable issue of fact as to the root cause of his dismissal from the Program. Because the express language of the contractual arrangement between the parties enabled Defendants to terminate Kimberg's tenure with the Program "if an error of commission or omission jeopardizes the safety and/or welfare of the patient," the District Court held Defendants were entitled to judgment as a matter of law.

Kimberg filed a Motion for Reconsideration of the District Court's summary judgment order, wherein he argued the court's

order improperly foreclosed any opportunity to explore the defenses raised in the Answers during discovery. The court denied Kimberg's motion, reasoning that the deposition testimony obtained during the oft-lengthened discovery period, replete with allusions to concerns harbored by Program administrators, provided Kimberg with ample notice that Defendants would mount a defense centered around the patient safety provision in the Handbook. Kimberg then filed this appeal.[3]

## III.

### A.

We review the District Court's decision to excuse Defendants' late filings under an abuse of discretion standard. *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 320 (3d Cir.2001); *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir.2000) (reviewing district court findings concerning excusable neglect for abuses of discretion). We will not disturb the trial court's exercise of discretion "unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Hanover Potato Products, Inc. v. Shalala*, 989 F.2d 123, 127 (3d Cir.1993) (internal quotation omitted).

Federal Rule of Civil Procedure 6(b)(2) permits a district court to extend the deadline for a motion paper "for good cause . . . if the party failed to act because of excusable neglect." *Fed.R.Civ.P. 6(b)(2).* At bottom, excusable neglect requires "a demonstration of good faith on the part of the party seeking an enlargement and some reasonable basis for noncompliance within the time specified in the rules." *Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1312 (3d Cir.1995) (internal quotation omitted).

In *Pioneer Inv. Services Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), the Supreme Court explained that, for Rule 6(b) purposes, excusable neglect is an "elastic concept." In assessing whether a party's neglect is excusable, a court must take into account "all relevant circumstances surrounding the party's omission," including (1) the danger of prejudice to the other party; (2) the length of the delay and its potential impact on judicial proceedings; (3) whether the cause of the delay was within the reasonable control of the moving party; and (4) whether the movant acted in good faith. *Id.* at 395, 113 S.Ct. 1489.[4] We have also considered the diligence of the moving party as well as whether the asserted inadvertence reflects either professional incompetence or an "easily manufactured excuse incapable of verification by the court." *In re Cendant Corp.*, 189 F.R.D. 321, 324 (D.N.J.1999) (citing *Dominic v. Hess Oil Corp.*, 841 F.2d 513, 517 (3d Cir.1988)).

### B.

Kimberg contends Defendants concocted their "patient safety" strategy only after the discovery window had closed and that he was unfairly surprised by the contents of their Answers. By allowing Defendants to file belatedly, Kimberg contends, the District Court effectively allowed them to procure a summary judgment order on the basis of affirmative defenses he lacked an adequate opportu-

---

**3.** The District Court had jurisdiction under 28 U.S.C. § 1332(a) We have jurisdiction under 28 U.S.C. § 1291.

**4.** Although the Court propounded this standard within the framework of a bankruptcy proceeding, we have applied it within the Rule 6(b) setting. *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 323–29 (3d Cir.2001).

nity to contest. This argument is unpersuasive. The District Court did not abuse its discretion in granting Defendants' joint motion.

Defendants demonstrated neither bad faith nor professional incompetence, nor did they cause Kimberg significant prejudice solely by virtue of their actions. As noted above, this case has had an unusual procedural history. On account of protracted litigation over Defendants' motion to dismiss and Kimberg's motion to file an Amended Complaint, nearly eighteen months passed between the filing of Kimberg's Complaint and the due date for Defendants' Answers. When the deadline came and went, the parties were fully engaged in discovery on Kimberg's breach of contract claim. Only in preparing their motion for summary judgment did Defendants come to realize they had failed to file these Answers. The atypicality of this procedural posture lends credence to Defendants' position that their failure to file within the allotted time period was an honest oversight and not part of a sinister, well-conceived plan to frustrate Kimberg's discovery efforts.

Furthermore, although the Answers may have provided the first concrete formulation of Defendants' patient safety strategy, Kimberg's protestations that he was blindsided by this proffered defense strain credulity.[5] From the outset of this litigation, Defendants consistently maintained they proceeded in accordance with Program guidelines. Their pleadings unfailingly contained accounts of Kimberg's deficient performance and references to corresponding contractual language—including the crucial Handbook passage concerning patient safety—enabling them to impose appropriate discipline. The deposition testimony of Harrington, Platko and Raskiewicz buttressed this position and formed the basis of Defendants' motions for summary judgment. Notably, these motions were filed before Defendants allegedly ambushed Kimberg with these defenses in their Answers. Kimberg could theoretically have elicited greater insight into Defendants' strategies by serving written discovery requests or by conducting additional depositions before the discovery deadline. Although Kimberg chose not to take such steps, the record is littered with evidence alerting him to the position Defendants would adopt in their Answers. Kimberg's argument that he was prejudiced by unanticipated defenses raised after the close of discovery thus rings hollow.

Presumably, any prejudice suffered by Kimberg on account of the late filing could have been cured by additional discovery. Although Kimberg now claims that Defendants implicitly conditioned their joint motion for leave to file untimely answers on the reopening of discovery, this is simply not so. In their motion, Defendants stated, "[to] the extent that any denials or defenses set forth in the Defendants' Answers raise new issues for discovery, Defendants do not object to the reopening of discovery on those matters." However, in denying Kimberg's motion for reconsideration, the District Court noted Kimberg "never sought an extension of discovery to address these issues." Indeed, Kimberg inveighed against the inconvenience and the cost that it would entail. Having

---

5. For example, during Raskiewicz's deposition, she testified

"[W]e are all student advocates all the time until the point comes where there's a safety issue, and then we switch gears wherein we move into being patient advocates. At that point, when we feel that the patient's safety is at risk, we believe, according to the handbook, that we follow the rules and we dismiss."

She then went on to explain Kimberg's clinical deficiencies had forced her to withdraw her support for her student in favor of securing the welfare of hospital patients.

moved on multiple occasions for extensions of time to complete discovery, Kimberg cannot credibly argue that one final extension to accommodate Defendants' filing would have resulted in severe prejudice.

A plaintiff does not suffer cognizable prejudice simply because he is forced to litigate issues raised in a late answer. *Kleckner v. Glover Trucking Corp.,* 103 F.R.D. 553, 556 (M.D.Pa.1984). Because we disfavor default judgments, doubts as to whether a defendant should be permitted to file an untimely answer should be resolved in favor of allowing a determination on the merits. *Gross v. Stereo Component Systems, Inc.,* 700 F.2d 120, 122 (3d Cir.1983). Therefore, any purported prejudice was attributable not to the untimeliness of Defendants' Answers but instead to the lack of additional discovery, an issue which Kimberg did not preserve for appeal.

## IV.

### A.

We review a grant of summary judgment *de novo,* applying the same standard that the District Court should have applied in determining whether summary judgment was appropriate. *Gonzalez v. AMR,* 549 F.3d 219, 223 (3d Cir.2008). Summary judgment is proper when there is "no genuine issue as to any material fact" and the moving party is "entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)(2).* An alleged factual dispute is "genuine" only if the evidence bearing on the disputed fact would permit a reasonable jury to find for the nonmoving party, and the fact is "material" only insofar as its adjudication "could affect the outcome of the case under the applicable substantive law." *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1158 (3d Cir.1990). When rul-

ing on a motion for summary judgment, a trial court must consider the evidence in a light most favorable to the nonmoving party—accepting its allegations as true, affording it the benefit of all legitimate inferences that may be drawn, and resolving any conflicted assertions in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976).

As we will explain, Kimberg has failed to demonstrate the District Court's summary judgment order turned on genuine issues of material fact being resolved in Defendants' favor. Therefore, we concur with that court's assessment that Defendants were entitled to judgment as a matter of law.

### B.

 "[T]he relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract." *Swartley v. Hoffner,* 734 A.2d 915, 919 (Pa.Super.Ct.1999). The contract between the parties "is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution." *Id.*

Defendants claim Kimberg was properly terminated from the Program according to the terms of the Handbook and that they therefore committed no contractual breach. As noted, the Handbook expressly provides that the school may place a student on probation and ultimately dismiss him from the program "if an error of commission or omission jeopardizes the safety and/or welfare of the patient." [6]

---

**6.** According to the Handbook's "program outcome criteria," a prospective graduate must

demonstrate a baseline level of competence in

Additionally, it provides that a "[f]ailure to follow instructions in the clinical area will result in immediate probation for the 1st offense. The second offense will result in termination from the school."

We concur with the District Court in finding the record discloses no genuine issue of material fact. Viewed in the light most favorable to Kimberg, the evidence suggests his clinical performance was, at best, deficient. Even affording him the benefit of the inference that his early evaluations showed him to be a stellar student, his fall from good standing is well-documented. The sequence of events leading to Kimberg's probationary period and eventual dismissal is chronicled in detail above. In placing Kimberg on probation, the Program provided him with written notice of the concerns his supervisors had registered. Among the delineated shortcomings were Kimberg's alleged disorganization, failure to grasp the entirety of the anesthetic picture, need for constant assistance and unwillingness to follow through with clinical tasks. Moreover, CRNAs working with Kimberg expressed apprehension about the prospect of Kimberg administering anesthesia to their family members. Their evaluation forms indicated that he had failed on one occasion to hook up a patient's air line and had demonstrated a substandard grasp of pharmacology and the rationale for drug uses and dosages.

The record simply fails to support Kimberg's position that Defendants acted outside the scope of the contractual agreement in invoking an overriding concern for patient well-being as justification for placing him on probation and ultimately dismissing him from the Program. According to Program policies, administrators may extend a probationary period to help a student if they feel he is capable of being reformed. Otherwise, the student is given the opportunity to withdraw or else be terminated from the Program. In notifying Kimberg of his dismissal, Raskiewicz wrote that he had "fail[ed] to progress during [his] probationary period." With concern for patient well-being paramount among the reasons Kimberg had landed on probation in the first place, Kimberg's inability to allay administrators' fears on this front rendered their decision to dismiss him appropriate under the terms of the Handbook. Kimberg was fully aware of the allegations leveled against his clinical competence, and Defendants properly exercised their contractual prerogative to safeguard patient safety.[7]

---

five general topic areas, foremost of which is "patient safety." To show the requisite degree of acquired skill and knowledge within this field, a student must, *inter alia*, "[b]e vigilant in the delivery of patient care," "[p]articipate in the positioning of patients to prevent injury," and "[u]tilize standard precautions and appropriate infection control measures." Raskiewicz recounted a slew of incidents that called into question Kimberg's performance in this area. On separate occasions, she testified, Kimberg professed an inability to adjust a patient's blood pressure cuff from a pediatrics setting to an adult-sized setting and then unilaterally decided to halve the dosage of a patient's prescription despite indications her blood pressure was "very high."

7. Kimberg argues the contract required Defendants to follow Policy No. 60.6, a progressive series of disciplinary procedures. The Handbook, which stresses that the rules of the Program supersede those of the Wyoming Valley Health Care System (including Policy 60.6) and which indicates only that students must follow Policy 60.6 as it relates to student status, suggests otherwise. And, as the District Court noted, the policy lists behaviors that are inappropriate and which might precipitate disciplinary action. Significantly, behaviors that constitute threats to patient safety, such as those which prompted Defendants to place Kimberg on probation, are not among those listed.

## C.

■ Moreover, Kimberg claims that Defendants breached the parties' agreement by denying Kimberg the opportunity to be represented by legal counsel at his hearing before the University's Due Process Review Committee. As the District Court properly concluded, this position lacks support in either Pennsylvania law or within the scope of the contractual language.

Because the relationship between a private college and its students is contractual in nature, a student being disciplined is entitled "only to those procedural safeguards which the school specifically provides." *Psi Upsilon of Phila. v. Univ. of Pa.*, 404 Pa.Super. 604, 591 A.2d 755, 758 (1991) (quotation omitted). While private colleges enjoy wide latitude to structure their internal disciplinary procedures as they see fit, *Schulman v. Franklin & Marshall Coll.*, 371 Pa.Super. 345, 538 A.2d 49, 52 (1988), they are limited by the principle that such procedures must be "fundamentally fair," *Psi Upsilon*, 591 A.2d at 758.

The Program's Due Process Policy grants students the right to appeal any action they feel violates their rights under established policies, rules and regulations. The terminal step of the grievance procedure consists of a hearing before a Due Process Review Committee, a body charged with rendering an impartial determination as to the fairness of the sanctions imposed upon the student. The Committee is empowered only to decide if the student was afforded adequate process; determining the clinical competency of the student rests within the exclusive preserve of the student's CRNA supervisors.

First, the District Court correctly concluded that a college's disciplinary procedures are not necessarily unfair simply by virtue of their failure to provide a student with the right to representation by counsel. The Pennsylvania Commonwealth Court has held that public universities do not have to afford a " 'full-dress judicial hearing,' subject to the rules of evidence or representation by counsel" to satisfy the "fundamental fairness" standard. *Ruane v. Shippensburg Univ.*, 871 A.2d 859, 862 (Pa.Commw.Ct.2005). Private institutions need not endow their students with the constitutional due process protections that state universities are obligated to provide. *Psi Upsilon*, 591 A.2d at 758. Hence, as the District Court astutely noted, "[i]f fundamental fairness is met in a public school without representation by counsel, then surely, it is met in a private school where there is not representation by counsel."

Second, the Handbook did not entitle Kimberg to representation by counsel at the Due Process Review Committee hearing. Although the Due Process Policy does not stipulate that a student who requests a hearing will be prohibited from appearing alongside an attorney, Defendants bore no obligation to afford Plaintiff protections in addition to those expressly embodied in the written agreement. *Boehm v. Univ. of Pa. Sch. of Veterinary Med.*, 392 Pa.Super. 502, 573 A.2d 575, 579 (1990) ("[T]he relationship between a private college and its students [is] contractual in nature. Therefore, students who are being disciplined are entitled only to those procedural safeguards which the school specifically provides."). As explained above, the University's procedures were sufficiently robust as to be fundamentally fair. In disallowing Plaintiff's request, Defendants merely opted to abide by the literal terms of the Handbook rather than to insert a new safeguard alongside those already in place.

## V.

For the foregoing reasons, we will affirm the judgment of the District Court.